**UNITED STATES of America,**
**Appellant,**

v.

**Ivo MARTINEZ–GONZALEZ, and Aurora Sanchez-Sanchez, Appellee-Defendants.**

**No. 546, Docket 81–1366.**

United States Court of Appeals,
Second Circuit.

Argued March 23, 1982.

Decided July 30, 1982.

**94**

judgment of the United States District Court for the Eastern District of New York (Bartels, J.) suppressing evidence seized in an apartment in connection with the warrantless arrest of appellee-defendant, Ivo Martinez-Gonzalez. We reverse.

I.

A. The pertinent facts, as found by the district court and not here challenged, with minor additions reflected in the record, are as follows:

1. On February 18, 1981, while stopped at a traffic light in Queens, William Mockler, a Special Agent of the Drug Enforcement Administration ("DEA"), recognized defendant Sanchez sitting in the automobile next to his. Mockler had arrested Sanchez in 1979 in connection with an investigation of cocaine trafficking, and she had pled guilty to illegal presence in the United States. Mockler knew that Sanchez had been sentenced to two years' imprisonment commencing in June 1979, and that she would have been deported after serving her sentence. He therefore concluded that her presence in this country was almost certainly illegal.

Mockler caused the car in which Sanchez was riding to pull over. In response to questions from Mockler and other agents accompanying him, the driver of the car produced a valid driver's license but could not produce a registration for the car. Sanchez, who was sitting on the passenger side, stated that her name was Marta Gonzalez, which Mockler knew was false. She also could not produce the car's registration but stated that she had borrowed it from a friend whose name she did not know.

On the basis of these answers, Mockler asked Sanchez to accompany him to a nearby police station for the purpose of checking her identity. Sanchez agreed to go.

At the station Mockler and other agents questioned Sanchez about her presence in this country. In response she produced several papers bearing names other than San-

Jane Simkin Smith, Asst. U. S. Atty., Brooklyn, N. Y. (Edward R. Korman, U. S. Atty. for the Eastern District of New York, John B. Latella, Jr., Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellant.

Edward R. Panzer, New York City, for appellee-defendant, Aurora Sanchez-Sanchez.

Michael L. Santangelo, New York City, for appellee-defendant, Ivo Martinez-Gonzalez.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and FRIEDMAN,* Chief Judge, United States Court of Claims.

FRIEDMAN, Chief Judge, United States Court of Claims:

This is an appeal by the United States pursuant to 18 U.S.C. § 3731 (1976) from a

* Sitting by designation.

chez or Marta Gonzalez and gave two different birth dates. She also placed on the table a rent receipt bearing yet another name, for apartment 5M at 164–20 Highland Avenue in Queens. Ultimately Sanchez admitted her true identity and was turned over to agents of the Immigration and Naturalization Service who had been summoned to the police station and who arrested her for violation of the immigration laws.

A search of Sanchez's handbag was conducted which revealed: (1) a set of keys; (2) the rent receipt for apartment 5M; (3) money; and (4) a piece of paper containing telephone numbers and several figures.

2. That evening Mockler and other agents went to the building in which apartment 5M was located, hoping to locate Disney Mendez (whose name may be "Daisey"), a daughter of Sanchez, for whom a state arrest warrant was outstanding. Upon arriving at 164–20 Highland Avenue, the agents learned from the building superintendent and his wife that a woman named "Pagan," whom the superintendent identified from a photograph as Sanchez, lived in apartment 5M with her daughter. The description of the daughter matched that of Disney Mendez, and the name on the rent receipt found in Sanchez's handbag was "Lucelli Pagan." From the doorman, the agents learned that the daughter had returned to the apartment recently.

The agents then went to apartment 5M. They knocked on the door, and announced in Spanish and English that they were the police. No one responded, but the agents heard people moving inside, as well as the sound of a television set. The agents then used one of the keys found in Sanchez's handbag to open the door and entered the apartment.

Two of the officers found a locked bathroom door. They repeatedly banged on it and shouted, "Police, police—open up the door." A female responded that she was using the facility. A woman soon emerged from the bathroom after the toilet had been flushed. The agents escorted her to the living room, where a man found hiding in a second bathroom already was sitting. The woman identified herself as Maria Mendez; the agents did not ask whether she was "Disney" Mendez. The agents asked Mendez whether there were any drugs or weapons in the apartment. She responded, "No, you could look around." The agents advised Mendez that she need not consent to a search, but when she was asked whether she would agree, she replied affirmatively.

In the search, the agents found and seized the following: (1) traces of cocaine in a plastic bag found in the toilet in the bathroom from which Mendez emerged; (2) a .38 caliber revolver; (3) currency; (4) several notebooks; and (5) a small quantity of marijuana.

Shortly after the search, another agent arrived with a photograph of Disney Mendez. Although there was a resemblance, the young woman found in the apartment was not Disney Mendez, but Disney's sister, Maria. On the basis of the evidence found in 5M, Maria Mendez was arrested for violating the federal narcotics laws.

3. The following day, February 19, while Sanchez and her daughter were being arraigned in Brooklyn, Detective Vallely (one of the agents who had participated in the search of apartment 5M) inventoried all of the evidence seized the day before, including the contents of Sanchez's handbag, at DEA's Manhattan headquarters. He discovered in the bottom of an eyeglass case found in the handbag a crumpled cash receipt for rent on apartment 7F, located at 87–15 16th Street, across the street from the building in which apartment 5M was located. Vallely informed Mockler of the discovery late that afternoon. Mockler directed Vallely and the other agents to investigate the apartment.

The building superintendent at 87–15 16th Street and his wife informed the agents that (1) apartment 7F had been leased one month earlier by a young Hispanic male in the company of a female, whom they identified from photographs as Sanchez; (2) no furniture had been moved into the apartment other than a folding cot; (3) the couple had observed the young man

carrying four or five very heavy flight bags into the apartment; (4) only the electricity, but not the gas for cooking, had been turned on; (5) Sanchez had been seen entering the building with a pot of food to take to the apartment; (6) Sanchez had keys for the lobby door and stated that she also had a key to 7F; (7) a new lock had been installed at 7F; (8) the man who was driving the car in which Sanchez was stopped and the male arrested in apartment 5M had been seen on the seventh floor of the building.

In peering under the door of apartment 7F, Detective Vallely saw no furniture.

When Mockler arrived at the apartment, he and Vallely telephoned an assistant United States attorney to determine whether a search warrant could be obtained. The officers concluded that due to the lateness of the hour a warrant could not be obtained that evening. Mockler decided to keep 7F under surveillance. The agents then went to the stairwell on the seventh floor, and waited.

Later, one agent saw a young Hispanic man, fitting the description the superintendent had given of the lessee of the apartment, standing in the hallway outside 7F. The door to the apartment was open. The officers began walking at a normal pace toward the man, who later was identified as the defendant Martinez. Their badges were displayed, and they identified themselves (in Spanish and English) as police officers. Martinez stared at them for a second, looked frightened, and ran back into the apartment.

The agents rushed to block the door from closing, but Martinez dropped the bolt in the lock. After kicking and banging on the door and yelling "police" several times, the agents unlocked the door with one of the keys found in Sanchez's handbag. As they stood at the threshold with their guns drawn, the agents heard the sound of a toilet flushing. They rushed into the apartment and found Martinez standing over a toilet bowl with a sizable quantity of white powder in plastic bags at his feet. The officers arrested Martinez and seized the

white powder, which the government asserts is cocaine, and other narcotics-related items they found in plain view.

B. Martinez, Sanchez, and Maria Mendez were indicted for conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846 (1976). They also were charged with the substantive offense, in violation of 21 U.S.C. § 841(a)(1) (1976 & Supp. IV 1980).

The defendants moved to suppress the statements they made at the time of their arrest, as well as the evidence seized from Sanchez at the time of her arrest and from apartments 5M and 7F. The district court refused to suppress the evidence seized in connection with Sanchez's arrest but suppressed the evidence seized from the two apartments. The defendants have not appealed from the district court's ruling on the first category of evidence, and we shall not discuss that issue further. The government has appealed only from the suppression of the evidence seized from apartment 7F. (Maria Mendez is not a party to the appeal.) Because of the interrelation of the seizures from the two apartments, however, we describe the district court's ruling with respect to both suppressions.

1. The court suppressed the evidence seized in apartment 5M because of the agents' violation of a New York statute authorizing a police officer acting pursuant to an arrest warrant to "enter any premises in which he reasonably believes the defendant to be present" provided that before such entry he gives notice "of his authority and purpose" to the occupants. N.Y.Crim. Proc.Law §§ 120.80(4) & (5) (McKinney 1982). The court stated that the agents reasonably could have believed that Disney Mendez, for whom an arrest warrant was outstanding, was inside the apartment, and that if the agents had complied with the statute, the entry into the apartment would have been valid.

The court held, however, that because the agents merely announced their authority but did not state their purpose—to arrest Disney Mendez—the entry into the apartment violated the New York statute. It

concluded that the consequence was that the ensuing search and seizure of items found in the apartment violated the fourth amendment. The court further ruled that Maria Mendez's consent to the search of the apartment was involuntary and did not justify the search.

2. The court held that before Martinez ran back into apartment 7F "the agents had other evidence linking Sanchez to drug-dealing based on their earlier investigation" and that Martinez's "hasty retreat transformed their already reasonable suspicions into probable cause to arrest" him. In its opinion denying the government's request for reargument, however, the court held that "the probable cause did not exist until after Martinez had locked the door." For this reason, the court ruled that Martinez's arrest could not "have been set in motion in a public place . . . since Martinez would not have been subject to arrest if he had simply remained in the corridor and not retreated."

The court stated that under *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), "[w]arrantless entry into a home in order to make a routine felony arrest on probable cause [or to search for evidence or contraband] is not permitted in the absence of exigent circumstances." Relying on *United States v. Gomez*, 633 F.2d 999 (2d Cir. 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981), the court held that exigent circumstances for entering apartment 7F did not exist because "[t]here were no sounds indicating destruction of evidence in this case, and there was no testimony from the agents that they feared such destruction." Because of its conclusion that probable cause to arrest Martinez did not arise until he had bolted the door to the apartment, the court also rejected the government's argument based on *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976), that the entry into the apartment was valid because made in "hot pursuit" of Martinez after he had fled.

## II.

The validity of the government's seizure of the evidence in apartment 7F depends upon two questions: (A) whether the agents had probable cause to arrest Martinez when he fled into the apartment but before he bolted the door and, if so, (B) whether the agents' warrantless entry into the apartment was justified by exigent circumstances, including the doctrine of hot pursuit. We answer both questions affirmatively and therefore uphold the seizure.

A. 1. A preliminary issue in the probable cause inquiry is whether the evidence seized from apartment 5M, which the district court suppressed, may be considered in determining the existence of probable cause to arrest Martinez. As noted, the district court found that this evidence consisted of traces of cocaine found in a plastic bag in a toilet bowl, a .38 caliber revolver, currency, several notebooks, and a small amount of marijuana. The record shows that there were also traces of cocaine in the toilet bowl itself and on a paper towel in the bowl, that the currency amounted to $9,000, and that a set of weights for an Ohaas triple-beam scale (which apparently frequently is used to weigh narcotics) also was found there. Although it is unclear whether in making its probable cause determination the district court considered the evidence seized from apartment 5M, we hold that that evidence may be considered.

The fact that the evidence obtained in apartment 5M has been suppressed as a product of a seizure that violated the fourth amendment does not necessarily mean that that evidence cannot be considered in determining whether the agents had probable cause to arrest Martinez. "Even in situations where the exclusionary rule is plainly applicable, we have declined to adopt a '*per se* or "but for" rule' that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest. *Brown v. Illinois*, 422 U.S. 590, 603 [95 S.Ct. 2254, 2261, 45 L.Ed.2d 416] (1975)." *United States v. Ceccolini*, 435 U.S. 268, 276, 98

S.Ct. 1054, 1060, 55 L.Ed.2d 268 (1978). Instead, the question is whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" *Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) *quoting Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939); *see also Ceccolini*, 435 U.S. at 273–74, 98 S.Ct. at 1058–1059.

■ In the present case the connection between the illegal seizure of evidence in apartment 5M and Martinez's arrest was too attenuated to bar consideration of the former evidence in determining the existence of probable cause.

First, several significant events, occurring after the seizure at apartment 5M and largely unrelated to it, intervened prior to the arrest of Martinez at apartment 7F and substantially broke the causal connection between the 5M seizure and Martinez's arrest. *See Taylor v. Alabama*, —— U.S. ——, ——, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); *Brown v. Illinois*, 422 U.S. at 603–04, 95 S.Ct. at 2261–2262 (and cases cited therein). In an unrelated reexamination of Sanchez's handbag after the 5M incident (see immediately below), the existence of apartment 7F first was discovered. After that, the agents obtained the information that established probable cause (discussed below) largely from their discussion with the superintendent of the building in which apartment 7F was located and his wife and from the action of Detective Vallely in peering under the door of the apartment.

Probable cause to arrest Martinez ultimately resulted from two events that were independent of, and could not have been foreseen at the time of, the illegal conduct at apartment 5M: (i) Martinez's unexpected appearance in the public hallway in front of the door of apartment 7F, and (ii) his precipitous retreat into the apartment when the agents, identifying themselves as police, attempted to approach him in the hallway. Had it not been for these two events, prob-

able cause to arrest Martinez would not have arisen.

The agents were in the stairwell of the hallway merely to keep the apartment under surveillance. Presumably they planned to obtain a search warrant the next morning, since they had endeavored to obtain one that evening but had been unable to do so because of the late hour.

Second, the agents became aware of the possible involvement of apartment 7F not because of anything they found in apartment 5M but because of the rent receipt for apartment 7F that Detective Vallely found in Sanchez's handbag when he reexamined it on the day after the search of apartment 5M. *See, e.g., Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (evidence in some sense connected with illegal police conduct will not be suppressed "[i]f knowledge of [that evidence] is gained from an independent source"); *see also United States v. Alvarez-Porras*, 643 F.2d 54, 59–60 (2d Cir. 1981), *cert. denied*, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1982) (although the doctrines of "attenuation" and "independent source" are technically distinct, they frequently overlap). Vallely made that reexamination not to discover the location of some "stash pad" that the evidence seized at 5M led them to believe might exist, but rather simply to inventory the property taken from Sanchez the preceding day.

In addition, the other information that led the agents to suspect 7F, including the agents' awareness of Sanchez's prior alleged cocaine trafficking, was obtained independently of the illegal conduct at 5M. The evidence seized from apartment 5M merely confirmed the agents' reasonable suspicion that apartment 7F was being used as a "stash pad" for narcotics.

Third, barring the consideration of the evidence seized in apartment 5M in determining probable cause for the arrest of Martinez would not further significantly a basic purpose of the exclusionary rule of deterring the police from violating the fourth amendment. *See Ceccolini*, 435 U.S.

at 275, 98 S.Ct. at 1059; *Dunaway v. New York*, 442 U.S. 200, 226, 99 S.Ct. 2248, 2263, 60 L.Ed.2d 824 (1979) (Rehnquist, J., dissenting); *Brown*, 422 U.S. at 608–12, 95 S.Ct. at 2264–2266 (Powell, J., concurring); Pitler, *"The Fruit of the Poisonous Tree" Revisited and Shepardized*, 56 CALIF.L. REV. 579, 588–89 (1968); *cf. Taylor*, —— U.S. at ——, 102 S.Ct. at 2669. The agents entered apartment 5M because they were seeking to arrest Disney Mendez pursuant to a warrant. As the district court held, they had reasonable cause to believe that she was inside the apartment and, had they fully complied with the statute, the entry would have been proper.

The agents' failure to state their purpose for seeking entry into the apartment after they had identified themselves as police was not the kind of flagrant police misconduct which frequently has characterized cases in which evidence was suppressed as the "fruit of the poisonous tree." *See, e.g., Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262; *Taylor v. Alabama*, —— U.S. at ——, 102 S.Ct. at 2669. The deterrent purpose of the exclusionary rule adequately would be served by the suppression of the evidence seized from apartment 5M. That purpose does not require also ignoring that evidence in determining the existence of probable cause to arrest Martinez.

■ 2. As the district court ruled, the information the agents had when they placed apartment 7F under surveillance created "strong suspicions based on their experience that 7F was being used as a 'stash pad' for drugs as part of Aurora Sanchez's suspected drug dealing, and therefore justified them in detaining for purposes of a *Terry [v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)] stop any persons seen entering or exiting 7F. *United States v. Vasquez*, 638 F.2d 507 (2d Cir. 1980) [*cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981)]." The district court summarized this information as follows:

> From the building superintendent and his wife they learned that 1) 7F had been leased one month earlier in the name of one Luis Fatarusso by a young Hispanic

male in the company of a woman whom they identified in photos as Sanchez; 2) they had seen the young male carrying five heavy flight bags into the apartment, but that no furniture had been observed by them being moved in other than a folding cot; 3) of the utilities, only the electricity and not the gas (for cooking) had been turned on; 4) Sanchez had been seen entering the building with a pot of food to take to 7F; 5) she had keys for the lobby door, and stated that she likewise had a set for 7F; 6) a new top lock had been installed in 7F; and 7) the man ... arrested the previous day with Sanchez had been seen on the seventh floor, as well as the man arrested with Mendez in 5M. From Vallely's own observations in peering under the door, he saw no furniture. In addition, by this time the lab reports on the water and napkin seized from the toilet bowl in 5M had reached the agents, confirming their positive field test for cocaine.

These facts, "when viewed collectively by experienced police officers" (*United States v. Gomez*, 633 F.2d at 1005, footnote omitted) (the agents here each had been in law enforcement over 10 years), created a reasonable suspicion that illegal narcotics activities were being conducted in apartment 7F and that Martinez was involved in those activities. *Cf. United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

■ When Martinez, who fit the superintendent's description of the young man who had leased the apartment a month earlier in the company of Sanchez, appeared in front of the door of apartment 7F, the agents were justified in attempting to interrogate him. In response to the agents' walking toward him at a normal pace while displaying their badges and identifying themselves as police officers, Martinez looked frightened and ran back into the apartment. The district court correctly ruled that in the circumstances, Martinez's "hasty retreat transformed their already reasonable suspicions into probable cause to arrest." *Sibron v. United States*, 392 U.S. 40, 66, 88 S.Ct.

1889, 1904, 20 L.Ed.2d 917 (1968); *Gomez,* 633 F.2d at 1007; *United States v. Soyka,* 394 F.2d 443, 453–54 (2d Cir. 1968) (*en banc), cert. denied,* 393 U.S. 1095, 89 S.Ct. 883, 21 L.Ed.2d 785 (1969).

In its opinion on the government's application for reargument, however, the district court apparently qualified that ruling by stating that "the probable cause did not exist until after Martinez had locked the door." The district court gave no reason for this limitation of its earlier ruling, and we cannot accept this restriction. The event that transformed the agents' reasonable suspicion into probable cause was Martinez's own manifestation of guilt evidenced by his flight from the agents back into the apartment when the agents approached him to talk to him. That event took place in the hallway outside apartment 7F, and probable cause to arrest Martinez existed as soon as he turned and fled.

It is the fact of "flight at the approach of . . . law officers [that is] strong indicia of *mens rea." Sibron,* 392. U.S. at 66, 88 S.Ct. at 1904. ·The bolting of the door by Martinez undoubtedly reinforced the agents' justified belief that apartment 7F was being used as a "stash pad," but probable cause to arrest Martinez for suspected possession of narcotics arose once Martinez turned and fled.

■ B. The district court correctly noted that under *Payton v. New York,* "[w]arrantless entry into a home in order to make a routine felony arrest on probable cause is not justified in the absence of exigent circumstances." *See also United States v. Reed,* 572 F.2d 412, 424 (2d Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). The court, however, interpreted our decision in *United States v. Gomez* as indicating that for there to be exigent circumstances, there must be either "the classic sounds indicating destruction of evidence" (*quoting Gomez,* 633 F.2d at 1008) or "some equivalent indication *beyond mere flight* that evidence might be destroyed" (emphasis in original). The court held that such indicia of destruction of evidence "were wholly lacking in this case," since

"[t]here were no sounds indicating destruction of evidence in this case, and there was no testimony from the agents that they feared such a destruction." The court therefore concluded that there were no exigent circumstances that justified the agents' warrantless entry into apartment 7F.

■ The district court took too narrow a view of what may constitute exigent circumstances. The concept is not limited to circumstances indicating the destruction of evidence. As we pointed out in *Reed,* applying the standards the District of Columbia Circuit Court of Appeals announced in *Dorman v. United States,* 435 F.2d 385, 391 (1970), there are "various factors that may be used to determine whether 'exigent circumstances' are present." 572 F.2d at 424.

These include (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*Id.; see also United States v. Campbell,* 581 F.2d 22, 26 (2d Cir. 1978).

■ The list is illustrative, not exclusive; other factors may be relevant. Moreover, the absence or presence of particular factors is not conclusive. The determination of exigent circumstances *vel non* necessarily turns upon whether in light of all the facts of the particular case there was an "urgent need" that "justif[ies]" a warrantless entry. *Dorman,* 435 F.2d at 391; *see also United States v. Martino,* 664 F.2d 860, 878–80 (2d Cir. 1981) (Oakes, J., concurring).

■ We hold that under the facts of this case there were exigent circumstances that justified the warrantless entry into apartment 7F. The agents had probable cause to believe that Martinez was trafficking in cocaine, which is a most serious offense,

often involving violence. *See, e.g., United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir. 1980).

The agents saw Martinez enter the apartment, and they had reasonable cause to believe that he was armed. They knew that a .38 caliber revolver had been found in apartment 5M and that Sanchez (who inhabited that apartment) and Martinez had close connections. Moreover, "to 'substantial dealers in narcotics,' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." *United States v. Oates*, 560 F.2d 45, 62 (2d Cir. 1977), *quoting United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Thus, the greater the delay in arresting Martinez, the greater the danger to the arresting agents and the community. *Dorman*, 435 F.2d at 392.

The agents also had reason to believe that apartment 7F was a "stash pad" in which narcotics were being stored. Since Martinez was aware of the agents' presence outside the door and their intent to enter, any delay in arresting him would be likely to result in the destruction of evidence. *United States v. Santana*, 427 U.S. at 43, 96 S.Ct. at 2409; *United States v. Gomez*, 633 F.2d at 1008; *United States v. Metz*, 608 F.2d 147, 154–55 (5th Cir. 1979), *cert. denied*, 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980); *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir. 1979); *United States v. Gardner*, 553 F.2d 946, 948 (5th Cir. 1977), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 753 (1978); *United States v. Soyka*, 394 F.2d at 454.

Finally, although the agents originally sought entry by kicking and banging on the door, a practice condemned in *Gomez*, 633 F.2d at 1006, the actual entry was made by the most peaceable means available in the circumstances—use of one of Sanchez's keys. *See Dorman*, 435 F.2d at 393.

Our decision in *Gomez* did not jettison consideration of all the surrounding circumstances as the basis for determining exigent circumstances and require instead a showing that the police believed that evidence

was being destroyed. All we held in *Gomez* was that in the circumstances of that case, "[t]he sounds of destruction of evidence established exigent circumstances sufficient to justify the warrantless arrests." 633 F.2d at 1008. Nothing in that decision indicates or even suggests that unless there were such sounds, exigent circumstances could not exist. Moreover, in this case the agents, after they had opened the door but before they entered the apartment, heard the flushing of a toilet.

Although the facts in *United States v. Santana*, are somewhat different from those here, the rationale of that decision supports the warrantless entry into apartment 7F to arrest Martinez. In *Santana* the police had probable cause to arrest Santana for having participated a few minutes earlier in a sale of narcotics to an undercover agent. The police saw her standing in the doorway of her house. When they approached her, shouted "police" and displayed their identification, she retreated into the vestibule of the house. The police followed her through the open door and caught her in the vestibule, where they arrested her.

The Supreme Court upheld the warrantless arrest. The Court held that while standing in the doorway of her house, Santana was in a public place (427 U.S. at 42, 96 S.Ct. at 2409); that under *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), "the warrantless arrest of an individual in a public place upon probable cause did not violate the Fourth Amendment" (*id.*); that the case involved a true "hot pursuit" (*id.* 427 U.S. at 42–43, 96 S.Ct. at 2409); and that "a suspect may not defeat an arrest which has been set in motion in a public place and is therefore proper under *Watson*, by the expedient of escaping to a private place" (*id.* at 43, 96 S.Ct. at 2409).

The district court distinguished *Santana* on the basis of its ruling that probable cause did not arise here until Martinez had reentered apartment 7F and bolted the door, with the result that the arrest "could not, therefore, have been set in motion in a

public place." We have held, however, that probable cause to arrest Martinez arose as soon as he fled from the approaching agents. Martinez's arrest, like that of Sanchez, therefore was "set in motion in a public place" (the public hallways outside apartment 7F). Since the agents were pursuing Martinez when he locked the door in their faces, the agents were justified in entering the apartment to prevent Martinez's retreat from "thwart[ing] an otherwise proper arrest."

As Judge Leventhal pointed out, the "term ['hot pursuit'] is not a limitation but rather an illustration of the kind of exigent circumstance justifying entry without a warrant to arrest a suspect." *Dorman*, 435 F.2d at 391 (footnote omitted). Here exigent circumstances, including the "hot pursuit" of Martinez, justified the agents' warrantless entry into apartment 7F to arrest him.

The portion of the order of the district court that suppressed the evidence seized in apartment 7F is REVERSED.