**UNITED STATES of America, Appellee,**

v.

**Isaac ZABARE, a/k/a "The Rabbi", Defendant–Appellant.**

**No. 222, Docket 88–1076.**

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1988.

Decided March 27, 1989.

Michael Young, New York City, for defendant-appellant.

Kenneth J. Vianale, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Linda Imes, Asst. U.S. Atty. for S.D. N.Y., New York City, of counsel), for appellee.

284

Before VAN GRAAFEILAND, CARDAMONE and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York, after a three-day bench trial before Judge Charles S. Haight, Jr. Appellant Isaac Zabare was convicted of conspiring to deal in stolen goods in interstate commerce, in violation of 18 U.S.C. § 371; he was sentenced to three years' probation. Zabare contends, *inter alia*, that the evidence of his participation in the conspiracy charged was insufficient to support his conviction. Zabare also asserts that the district court improperly admitted physical evidence seized from his apartment at the time of his arrest, and post-arrest statements obtained from him, because the FBI agents who arrested him and searched his apartment had neither a warrant nor justification to do so.

Although the facts of this case present a close question on the sufficiency issue, we agree with the district court that the single transaction in which Zabare engaged was sufficient to support Zabare's conviction on the conspiracy charge. We also agree with the district court that there were "exigent circumstances" which justified the warrantless arrest of Zabare and the search of his home. Accordingly, we hold that it was not error to admit the evidence seized from Zabare's home and statements Zabare made at the time of his arrest. The judgment of conviction is therefore affirmed.

BACKGROUND

During the summer of 1983, the Federal Bureau of Investigation ("FBI") began an undercover sting operation in New York to apprehend persons who were obtaining and selling counterfeit and stolen tickets to public amusement events. The government's investigation focused on Richard Folch, who headed a conspiracy to distribute large numbers of counterfeit or stolen Ticketron tickets. Ticketron is a corporation engaged in the business of printing and selling tickets to the public for sports and entertainment events.

During the summer months of 1983, two undercover FBI agents, Dale Hackbart and Stuart Sturm, posed respectively as a "wheeler-dealer" and a "crooked employee" of Ticketron. One of Richard Folch's associates, Raymond Rosenthal, who was a confidential informant working with the FBI, arranged a meeting between Folch, Hackbart, and Sturm which took place on July 20, 1983. At that meeting, Hackbart presented Folch with an opportunity to acquire a large quantity of blank Ticketron tickets which Sturm had allegedly stolen from his employer. Folch offered to buy the "stolen" Ticketron tickets from Hackbart and Sturm. He informed the agents that he planned either to resell the tickets in blank form or to take them to a printer who would print specific information on them, after which he would sell the printed tickets to the public either directly or through ticket "scalpers." Folch also explained that he belonged to a group of about twelve to fifteen people who travelled around the country selling counterfeit tickets, that he had been doing this for quite a while, and that this was his sole source of income. After the meeting, Folch contacted his principal co-conspirator, a man by the name of Howard Sieger, to tell him that he had "a way of obtaining blank Ticketron tickets from Ticketron."

On July 22, 1983, Ticketron supplied Agent Hackbart with three boxes of blank Ticketron tickets for use in the sting operation, and three days later, Hackbart met with Folch at a Manhattan restaurant to tell him that the blank tickets were ready. Folch responded that he had scheduled a number of meetings with "his customers" for later that day to resell the tickets, as planned. Folch then gave Hackbart $1,000 as "good faith money for the business transactions later in the day." He also informed Hackbart that he was expecting someone known as "Tonto" to arrive shortly to purchase tickets from Folch at the restaurant.

When Tonto failed to appear at the restaurant, Folch left to go and look for him.

Although Folch was unable to locate Tonto during his search, he did meet the defendant Adolph Lindsay. Folch offered to sell Lindsay 800 tickets at two dollars apiece. Lindsay responded that he did not have enough money to buy the tickets himself, but that he could probably find a buyer for them. Folch agreed to pay Lindsay $200 as a "finder's fee," and Lindsay thereafter produced an individual named Mozelle Brown.

Folch brought Lindsay and Brown to meet Hackbart at an unspecified location in Manhattan near Madison Square Garden, at which point Folch announced: "These are the fellows who are going to buy the tickets." At Folch's direction, Hackbart removed a sealed bundle of 800 Ticketron tickets from his car and then waited for the transaction between Folch and Brown to conclude. After Brown had paid Folch $1600 in cash, Folch directed Hackbart to hand over the tickets to Brown, and then Folch paid Hackbart $400 for the tickets. Folch also paid Lindsay his finder's fee. Lindsay and Brown left and were arrested by agents shortly thereafter.

Later that day, after parting company with Hackbart, Folch discovered that Lindsay and Brown had been arrested. Folch immediately returned to the Manhattan restaurant, where he had arranged to meet Hackbart that afternoon, and told Hackbart about the arrests. Folch was very agitated by the news, but Hackbart calmed him by telling him that the arrests had been made not by FBI agents but by Ticketron's security personnel and New York City police. Folch apparently believed Hackbart, and the distribution of the balance of the "stolen" tickets proceeded. Folch, Hackbart, and Rosenthal, the confidential informant, drove to the home of appellant Isaac Zabare in Brooklyn, New York.

According to Folch's later testimony, Folch had met Isaac Zabare once, about two years earlier, outside of Madison Square Garden, and he knew Zabare to be a ticket scalper. Although Folch had not done business with Zabare previously, Folch called Zabare during the week preceding these events, told him he was "going to get a shipment of blank tickets," and asked Zabare if he wanted any of the Ticketron tickets. Zabare replied in the affirmative. Thereafter, the two men spoke at least twice on the phone to negotiate the terms of the sale, and it was agreed that Zabare would purchase about 5,000 tickets from Folch.

When the three men arrived at Zabare's residence with the tickets, Hackbart gave them to Folch, and then Folch and Rosenthal delivered a total of 6,400 tickets to Zabare in his second-floor apartment. The tickets were delivered in two installments of 3,200 each, with delivery of the second batch occurring ten to fifteen minutes after delivery of the first. Later, the evidence revealed that Zabare paid Folch a total of $9,600—$4,250 for the first 3,200 tickets and $5,350 for the second 3,200 tickets. Folch in turn paid $3,200 of that amount to Hackbart.

Soon after Folch, Rosenthal, and Hackbart left Zabare's home, Zabare was arrested by three FBI agents. The circumstances surrounding Zabare's arrest were as follows. Shortly after Folch and Rosenthal left Zabare's apartment, the FBI agents gained entry to his apartment by ruse, claiming that they were checking Zabare's apartment for leaky plumbing. The agents had neither an arrest warrant nor a search warrant. The agents, who had been waiting in a stairwell while the ticket sale took place, only approached Zabare's apartment when they believed that the transaction with Folch and Rosenthal had been completed. Upon entering, they handcuffed Zabare, informed him of his rights, and then searched him. The agents seized money and tickets from Zabare's pockets. They also seized $200 from a table in the living room. They then requested that appellant give them the Ticketron tickets, stating that, if need be, they would get a search warrant and search the apartment for the tickets. Appellant thereupon took one of the agents into his bedroom, located the tickets, and gave them to the agent. Appellant was driven to FBI headquarters, and his statement was taken. Zabare told the agents, among other things, that he

had had no previous business dealings with Folch, and that he had been "self-employed" as a "ticket scalper" for the previous four years.

A one-count indictment was filed and the case was assigned to Judge Haight. The indictment charged Isaac Zabare, Richard Folch, Howard Sieger, Adolph Lindsay, and Mozelle Brown with conspiring to receive stolen property in violation of 18 U.S.C. § 371. Judge Haight severed appellant's trial from that of his co-defendants, to allow for a psychiatric examination of Zabare. Richard Folch pleaded guilty to the conspiracy charge; Howard Sieger was convicted; and Adolph Lindsay and Mozelle Brown were acquitted of the conspiracy charge after a two-day bench trial before Judge Haight. This Court affirmed Sieger's conviction by memorandum order dated March 13, 1986. *United States v. Sieger*, No. 85–1354 (2d Cir. March 13, 1986).

Zabare waived his right to a jury trial and was tried before Judge Haight. By stipulation, the record of the 1984 trial of Zabare's co-defendants was made part of the record in Zabare's trial. Judge Haight found appellant Zabare guilty of conspiring to receive stolen property and filed a memorandum opinion dated September 17, 1986. Thereafter, Zabare was sentenced to three years' probation and required to perform two hundred hours of community service.

## DISCUSSION

Appellant Zabare raises two principal issues on appeal. First, Zabare contends that the evidence of his participation in a single, isolated transaction was not sufficient to establish his knowing participation in a criminal conspiracy to distribute counterfeit and stolen Ticketron tickets. Second, appellant contends that the FBI's warrantless entry into his apartment was not justified by "exigent circumstances," and, hence, was improper under the fourth amendment. We will address each of these claims *seriatim*.

A. *Single Transaction as Evidence of Membership in Conspiracy*

At the outset we announce again the oft-stated principles governing appellate challenges to the sufficiency of evidence in criminal cases. It is well-established that a defendant challenging the sufficiency of the evidence "bears a 'very heavy burden,'" *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986) (citation omitted), and that a verdict "must be sustained if there is substantial evidence ... to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Also, the evidence must be viewed "in the light most favorable to the Government," *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985), and the reviewing court must draw all reasonable inferences and resolve all issues of credibility in favor of the verdict. *United States v. Teitler*, 802 F.2d 606, 614 (2d Cir.1986). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the conviction must be upheld. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). With these principles in mind, we now turn to consider appellant's claims.

Zabare's principal contention before us is that he was entitled to the benefit of the so-called "single transaction rule," because his isolated purchase of tickets from Richard Folch was insufficient as a matter of law to establish that he knowingly joined in the conspiracy charged. The "single transaction rule" was adopted by this Court in *United States v. Zeuli*, 137 F.2d 845 (2d Cir.1943) (L. Hand, J.). Simply put, the rule states that "if a crime necessarily involves the mutual cooperation of two persons, and if they have in fact committed the crime, they may not be convicted of a conspiracy to commit it." *Id.* at 846. In *Zeuli*, this Court applied the rule to exonerate an individual in a situation such as the one herein, where the individual was found to have committed a crime with a member of an established conspiracy, and was accused of having joined the conspiracy by virtue of his single action. *See id.; see also United States v. Varelli*, 407 F.2d 735, 748 (7th Cir.1969); *United States v. Aviles*, 274 F.2d 179, 190 (2d Cir.), *cert.*

*denied,* 362 U.S. 974, 80 S.Ct. 1057, 1058, 40 L.Ed.2d 1009, 1010 (1960).

■ In conspiracy cases, where an "outsider" commits a single crime with a member of an existing conspiracy and is thereafter accused of having "joined" that conspiracy by virtue of his criminal association with one of its members, courts have applied the single transaction rule to hold that the mutual cooperation between the outsider and the conspirator in the context of the single crime is not a substitute for proof of an independent agreement on the part of the outsider to join the ranks of the conspiracy. *See, e.g., Aviles,* 274 F.2d at 190. In cases such as this, involving a purchase of contraband from a member of an existing conspiracy, courts have held that "the act of buying stolen goods, even goods known to have been stolen, standing alone, does not make the purchaser a member of [an existing] conspiracy to steal the goods or to receive stolen goods." *United States v. Solomon,* 686 F.2d 863, 876 (11th Cir.1982); *see Varelli,* 407 F.2d at 748; *Zeuli,* 137 F.2d at 846. While it is true that a purchaser of illicit drugs or stolen goods may advance the ultimate goals of a criminal conspiracy simply by virtue of the revenues his purchase generates, the single purchase alone does not *per se* evidence the buyer's intent to knowingly join and participate in that conspiracy. As the Eighth Circuit stated in *United States v. Prieskorn,* 658 F.2d 631 (8th Cir.1981):

> The relationship of buyer and seller *absent any prior or contemporaneous understanding beyond the mere sales agreement* does not prove a conspiracy to sell, receive, barter or dispose of stolen property although both parties know of the stolen character of the goods. In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell. There is no joint objective.

*Id.* at 634 (emphasis in original) (quoting *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978) (citations omitted)).

■ Notwithstanding all of the above, it also is settled in this Circuit that a defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy. *See, e.g., United States v. Murray,* 618 F.2d 892, 903 (2d Cir.1980); *United States v. Torres,* 503 F.2d 1120, 1123–24 (2d Cir. 1974); *United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir.1971) (per curiam); *United States v. Agueci,* 310 F.2d 817, 835–36 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The test that has evolved for determining whether a single act is sufficient to support a conspiracy conviction is whether " 'the qualitative nature' of the act 'viewed in the context of the entire conspiracy' ... in a particular case" supports beyond a reasonable doubt the inference "that an individual is involved in a conspiracy." *Murray,* 618 F.2d at 903 (quoting *Torres,* 503 F.2d at 1124). In this case, appellant argued to the district court that the government's proof was insufficient to show that he knowingly joined Folch's conspiracy to buy and sell stolen Ticketron tickets. Zabare contended that the most the evidence showed was that he had participated in a single, isolated transaction involving the purchase of Ticketron tickets from Folch on July 25, 1983. In response, the government asserted that Zabare's participation in a conspiracy to sell Ticketron tickets could reasonably be inferred from the surrounding circumstances leading up to the sale, the sale itself, and the magnitude of the purchase.

At the earlier trial of Zabare's alleged co-conspirators, Judge Haight found, and the government did not contest, that the single-count indictment charged what has been commonly referred to as a "wheel" conspiracy. *See Kotteakos v. United States,* 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242–43, 90 L.Ed. 1557 (1946); *see, e.g., United States v. Mealy,* 851 F.2d 890, 896 (7th Cir.1988); *United States v. Tarantino,* 846 F.2d 1384, 1392 (D.C.Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). As Judge Haight noted, Richard Folch was the "center of the wheel," and "[h]e intended to sell Ticketron blanks to a number of purchasers" who formed the respective "spokes" of the conspiracy "wheel." Accordingly, Judge

Haight stated that, in order for the government to convict the individual purchasers in this case as members of the single conspiracy alleged in the indictment, "the Government was obliged to prove beyond a reasonable doubt that [each purchaser] had knowledge of the far-reaching, overall scheme of which Folch ... formed the center core." *See United States v. Sieger,* No. SS84 Cr. 158–CSH, 1985 WL 565 (S.D.N.Y.) (Memorandum Opinion and Order of April 19, 1985). Because the indictment charged Zabare and his alleged co-conspirators with participation in a single conspiracy to distribute stolen Ticketron tickets, the focus of the district court's inquiry in both of these cases was on whether the government had proved that each of the charged purchasers had sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the "rim of the wheel to enclose the spokes." *Kotteakos,* 328 U.S. at 755, 66 S.Ct. at 1243; *see also United States v. Manarite,* 448 F.2d 583, 589–90 (2d Cir.) ("In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the 'spokes' knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy."), *cert. denied,* 404 U.S. 947, 98 S.Ct. 281, 285, 287, 298, 30 L.Ed.2d 264 (1971).

■ In the case of Zabare's alleged co-conspirators, the district court found the evidence insufficient to link the defendants Lindsay and Brown to the conspiracy, but sufficient to find Folch's principal co-conspirator Howard Sieger guilty of participating in the conspiracy charged. While the district judge thought that the facts of Zabare's case presented a close question on the conspiracy issue, he nevertheless concluded that it was reasonable to infer that Zabare knew he was part of a wider criminal enterprise when he bought the stolen tickets. According to the district judge, the reasonable inferences for Zabare to draw from the single transaction in which he engaged were that: "(a) Folch had access to substantial quantities of blank Ticketron tickets; and [that] (b) Zabare was being offered an opportunity to purchase some, but not all, of that supply." The district judge went on to state: "It necessarily follows that Zabare could reasonably infer the 'horizontal' presence of other purchasers from Folch, who would then seek to process or resell the blank tickets in just the same manner that Zabare undoubtedly intended."

We believe the inferences drawn by Judge Haight from appellant's single purchase were warranted, and that the evidence adduced at trial was sufficient to support those inferences. The record evidence reveals the following: (1) prior to the July 25th transaction, Folch contacted Zabare for the first time in two years, having never done business with him before, informed him that he was *"going to get a shipment of blank tickets,"* and inquired whether Zabare would be interested in purchasing any of those tickets; and (2) on the day in question, Folch appeared at Zabare's apartment and sold him *6,400* blank Ticketron tickets—tickets with a resale value of at least $200,000. Based on the sheer quantity of tickets, the unusualness of the circumstances surrounding Folch's contact with Zabare, and Richard Folch's implicit representation to Zabare that he was but one of those invited to participate in distributing the tickets, Judge Haight was amply justified in finding that Zabare knew, or had reason to be aware, that Folch was engaged in a scheme to sell blank Ticketron tickets to one or more persons other than himself. As Judge Haight properly found, it was Zabare's awareness of the "horizontal scope" of Folch's network which linked him to the conspiracy charged and rendered his "single purchase" an act done in furtherance of that conspiracy. *See also United States v. Magnano,* 543 F.2d 431, 434 (2d Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1100, 1101, 51 L.Ed. 2d 536 (1977); *DeNoia,* 451 F.2d at 981; *Agueci,* 310 F.2d at 835–36.

We note that our holding today is based solely on the facts and circumstances presented in this case. Our decision should not be read to relax the requirement that

the government prove knowing participation in an existing conspiracy. Neither the prior contact between Folch and Zabare, nor the mere quantity of tickets, standing alone, would have sufficed to connect Zabare to the conspiracy. It is only when we consider these events together that we can confidently affirm the judgment of the district court.

On appeal, Zabare contends that he should have fared as well as two of his alleged co-conspirators, Lindsay and Brown, both of whom purchased only some of Folch's tickets and both of whom actually met Hackbart while dealing with Folch. Specifically, Zabare attacks the district court for failing to explain why the 800 tickets purchased by Lindsay and Brown, who were acquitted, would not also lead them to infer the presence of other horizontal purchasers. As the government correctly points out in response, this argument obscures the fact that Judge Haight's rulings as to these defendants were based not only on the size of the transactions, but on the entire circumstances surrounding the sale. As Judge Haight stated in his opinion: "The circumstances bringing Folch and Zabare together, and the magnitude of the transaction between those individuals, bear no qualitative resemblance to the single package of tickets fortuitously sold by Folch to Brown and Lindsay." We do not disagree and we find Zabare's argument on this point unpersuasive.

### B. *The Warrantless Entry, Arrest, and Search and Seizure*

■ The Supreme Court has repeatedly instructed that "it is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), and that in cases involving warrantless searches and seizures, the *government* bears the heavy burden of proving that entry into a defendant's home was justified. *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042–43, 29 L.Ed.2d 564 (1971). These same basic principles of Fourth Amendment law apply with equal force in the context of warrantless entries in the home made for purposes of arrest, even where there is independent probable cause for such an arrest. *Payton*, 445 U.S. 573, 100 S.Ct. 1371. As the Supreme Court stated in *Welch v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984),

> Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries.

*Id.* at 750, 104 S.Ct. at 2098.

■ Although the Supreme Court has declined to define the scope of the "exigent circumstances" doctrine, *id.*, two basic instances in which warrantless entry is justified are "hot pursuit" situations and when the destruction of evidence is imminent. *See United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409, 49 L.Ed.2d 300 (1976) (hot pursuit of fleeing felon); *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (destruction of evidence). Also, entry may be justified if the life or person of a law-enforcement officer or other person is in imminent danger. *See United States v. Dowell*, 724 F.2d 599, 602–03 (7th Cir.), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984); *United States v. Williams*, 633 F.2d 742, 744 (8th Cir. 1980); *United States v. Agapito*, 620 F.2d 324, 335–36 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

At the hearing on appellant's motion to suppress, the government argued that the arresting agents were required to act swiftly and without a warrant in order to avoid the substantial risks that would have resulted if Zabare were not arrested before he opened the packages of tickets he had just purchased and discovered void markings on them. According to the government, "exigent" circumstances existed in this case because the agents could reasonably have believed that as soon as Zabare discovered the void markings, he would telephone other members of the conspiracy to warn them about the phony tickets and thereby endanger the lives of the confiden-

tial informant and the undercover agent. Alternatively, the government also argued that the government agents could reasonably have believed that Zabare would destroy the blank Ticketron tickets as soon as he discovered that some of them had been marked void, although none of the arresting agents who testified at the hearing proffered this rationale as a justification for the warrantless entry.

After concluding that there was insufficient "opportunity to obtain a warrant until the events immediately preceding the arrest had taken place," the district court accepted the government's claim of exigent circumstances. While the court stated that the possible destruction of evidence was not "as strong an exigent circumstance" as the other proffered reason for the warrantless entry, the court was persuaded that the entire operation, as well as the safety of the undercover agents, might be compromised if Zabare attempted for whatever reason to "spread the alarm ... among the grapevine, somewhat in the nature of some less than honorable Paul Revere." Accordingly, the district court upheld the warrantless entry and denied Zabare's motion to suppress.

■ On appeal, Zabare raises two challenges to the district court's finding of exigent circumstances. Appellant first argues that the government's two claimed exigencies were based on pure speculation, and that there was "no evidence in this case" that Zabare would either attempt to contact other co-conspirators or destroy the marked tickets. Alternatively, appellant contends that the government agents "created" the exigent circumstances herein by using Ticketron tickets that were stamped "void," and that the government is therefore not entitled to rely on these circumstances as justification for the warrantless entry. We are not persuaded by these contentions.

As a threshold matter, we note that in *United States v. Cattouse,* 846 F.2d 144 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988), we declined to accept the argument that circumstances are not "exigent" if the method of investigation gives rise to the exigency. In *Cattouse,* the defendant contended that government agents had intentionally used pre-recorded "buy" money and an all-white surveillance team during an undercover narcotics operation in a predominantly black community in order to create the exigent circumstances which were ultimately used to justify the warrantless arrest of the defendant in his home. In rejecting that argument, we held that the government's use of white agents and pre-recorded buy money was not improper because "the investigative techniques were appropriate and were not adopted for the purpose of creating exigent circumstances." *Id.* at 148. In this case, Judge Haight found that the government's decision to mark the tickets "void" was "reasonable" in light of the concern that something might go "wrong with the operation" and the tickets might be disseminated to the public. We do not disagree, and therefore we reject appellant's argument that the government herein manufactured the exigent circumstances in bad faith.

■ Appellant further contends on appeal that the government's claim of exigent circumstances was purely speculative, and, hence, that the evidence seized as a result of the agents' warrantless entry into his home should have been suppressed. As we noted in *United States v. Martinez-Gonzalez,* 686 F.2d 93 (2d Cir.1982), "[t]he determination of exigent circumstances *vel non* necessarily turns upon whether in light of all the facts and circumstances of the particular case there was an 'urgent need' that 'justified' a warrantless entry." *Id.* at 100. Examining the totality of the circumstances confronting the agents in this case, it is evident they knew that tickets which were clearly marked void on their face had just been delivered to and accepted by a suspected member of an alleged conspiracy. The issue this Court must resolve is whether it was objectively reasonable to conclude on the basis of these few facts that, when and if Zabare unwrapped the tickets and found them marked void, either: (1) "the destruction of evidence [was] imminent," *see United States v. Socey,* 846 F.2d 1439, 1446 (D.C.Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988), or (2)

the undercover operation and the lives of the confidential informant and Agent Hackbart would be endangered.

■ We need not consider all of the government's possible reasons for entering Zabare's home without a warrant because we accept the government's "destruction of evidence" claim as an objectively reasonable basis for the warrantless entry. *See United States v. Warner*, 843 F.2d 401, 403 (9th Cir.1988) (court may "determine whether the warrantless entry was justified upon some basis other than the one on which the police officer relied"). Although the agents who arrested Zabare subjectively believed that they had to enter the apartment in order to protect the undercover operation and possibly the life of Agent Hackbart, the test for determining whether a warrantless entry was justified by the presence of exigent circumstances is an objective one. *See id.; United States v. Talkington*, 843 F.2d 1041, 1044 (7th Cir. 1988) (applying an objective standard of reasonableness in assessing whether exigent circumstances existed); *see also United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.) (noting that " 'the proper standard for judging the constitutionality of a search is a *totally objective one* ' " (emphasis in original), quoting *United States v. Smith*, 643 F.2d 942, 944 (2d Cir.), *cert. denied*, 454 U.S. 875, 102 S.Ct. 350, 70 L.Ed. 2d 182 (1981)), *cert. denied*, —— U.S. ——, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987). As mentioned earlier, the government maintains that it also would have been objectively reasonable for these agents to assume that Zabare, upon discovering the marked tickets, would have believed himself to be the subject of an undercover investigation and that he then would have moved quickly to destroy the evidence of his participation in the transaction. Although we recognize that there was no extrinsic evidence of "urgency" of a type which this Court has frequently relied upon in upholding warrantless entries, *see, e.g., United States v. Farra*, 725 F.2d 197, 198 (2d Cir.1984) ("agitated conversation ... augmented by the sounds of much stirring about and the slamming of drawers or doors"), we believe that "reasonable, experienced agent[s]," *Talking-*

*ton*, 843 F.2d at 1044, would have been justified in concluding that the destruction of contraband was imminent based on the facts herein.

The facts that were before the arresting officers in this case are very similar to those in *United States v. Gallo–Roman*, 816 F.2d 76 (2d Cir.1987). In *Gallo–Roman*, a United States Customs mail technician in Florida intercepted two pieces of mail addressed for delivery in New York, and found that they contained cocaine secreted between photographs and false backs. The envelopes and their contents were forwarded to the Drug Enforcement Administration in New York, where DEA agents replaced the cocaine with a mixture of trace amounts of cocaine and dextrose. After repackaging the five photographs, an agent resealed the original envelope and placed it in the numbered post office box to which it had been addressed. A woman retrieved the envelope, and DEA agents followed her to a different address than the one listed on the face of the envelope. After waiting approximately twenty minutes, DEA agents went to the door of the apartment, rang the bell, identified themselves to the woman who opened the door, and then entered the apartment, whereupon the agents seized the evidence and arrested the defendant Gallo–Roman—all without a warrant.

On appeal, Gallo–Roman argued that (1) the police officers should have obtained a warrant prior to entering the searched premises, and that (2) no exigent circumstances existed which justified the warrantless search of his apartment and the seizure of the cocaine found therein, because "any belief on the agents' part that evidence might be destroyed was 'mere speculation.' " 816 F.2d at 79. Apropos appellant's first contention, we found that there was insufficient information available to the government agents to enable them to obtain a warrant prior to the events which took place just before the arrest and search, and insufficient time to obtain a warrant once the agents were in possession of sufficient information. *Id.* at 80–81. As for appellant's second claim, we stated:

> In our view ..., exigent circumstances did in fact exist, and the DEA case

agents reasonably could have expected the evidence seized to be destroyed before they could obtain a warrant. It was certainly reasonable for the agents to conclude that, once the envelope was opened, the false backs removed from the photographs, and the discovery made that the photographs had been tampered with, *it would become apparent that the scheme had been uncovered and that the authorities were near.* Under these circumstances, the agents reasonably could have anticipated that the perpetrator would act quickly to destroy the evidence of unlawful conduct.

*Id.* at 79 (emphasis added). We see no principled distinction between the *Gallo–Roman* case and this case.

Prior to their arrival at Zabare's residence on the date of arrest, the agents knew only that Folch intended to sell some of the tickets to a man called "the Rabbi," and that the Rabbi's first name was "Isaac." Apart from the foregoing, the confidential informant had given Agent Hackbart what he claimed was the Rabbi's telephone number. At the suppression hearing, however, Agent Hackbart testified that when he checked the telephone listings to see what name corresponded to the phone number, he found that the number belonged to one "Joseph Zabare," who resided at 99 Wilson Street in Brooklyn. Although, prior to arriving at 99 Wilson Street on the day of appellant's arrest, Agent Hackbart suspected that Joseph Zabare might be "the Rabbi," he did not know with any degree of reasonable certainty that "Joseph Zabare," "Isaac," and "the Rabbi" were one and the same person. Just as in *Gallo–Roman,* there was insufficient information available to the agents to enable them to obtain a warrant prior to the events leading up to the arrest of the defendant.

Also, as in *Gallo–Roman,* the undercover agents herein knew the tickets "had been tampered with," 816 F.2d at 79, and had reason to fear that when appellant discovered the markings he would surmise that "the authorities were near" and "act quickly to destroy the evidence" of his unlawful conduct. *Id.* We cannot say that

such conclusions would have been objectively unreasonable, even though these or even other beliefs by the agents turned out to be unfounded. As the Court of Appeals for the District of Columbia stated in *Socey,*

> If an experienced officer reasonably believes that those inside a home are likely to be alarmed and destroy evidence, the warrantless intrusion will be justified, even if it eventually develops that the home was unoccupied or those inside were careless or sloppy in their security, saw nothing at all, and *had no intention of destroying any contraband.*

846 F.2d at 1446 (emphasis added); *see also United States v. Rivera,* 825 F.2d 152, 156 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). Accordingly, we conclude that the district court did not err in admitting the evidence that was seized as a result of the agents' warrantless entry, arrest of appellant, and search of his apartment.

## CONCLUSION

We have considered all of appellant's other arguments and find them to be without merit. For the reasons stated, the judgment of conviction is affirmed.