**UNITED STATES of America, Appellee,**

v.

**William PEREZ, a/k/a "Willo," Lillian Perez, a/k/a "Lee," and Luis Garcia, a/k/a "Weo," Defendants–Appellants.**

Nos. 710–712, Dockets 89–1408, 89–1416 and 89–1417.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1990.

Decided May 23, 1990.

Alan G. Polak, New York City, for defendant-appellant William Perez.

Gerald J. McMahon, New York City, for defendant-appellant Lillian Perez.

Richard E. Kwasnik, New York City, for defendant-appellant Luis Garcia.

Kevin P. McGrath, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty. for the E.D. of N.Y., Emily Berger, Gregory J. O'Connell, Asst. U.S. Attys., on the brief), for Appellee.

Before VAN GRAAFEILAND, MINER and WALKER, Circuit Judges.

WALKER, Circuit Judge:

This appeal follows the defendants' third trial in the Eastern District of New York on charges of participating in a widespread heroin conspiracy, after which they received sentences ranging from fifteen to thirty-five years. Their first convictions resulted in jail sentences ranging from five to eight years. Defendants argue that the imposition of more severe sentences after a successful challenge to their first convictions, albeit by a different judge, violates the Fifth Amendment guarantee of due process. Defendants also ask us to vacate their sentences in an exercise of our supervisory power over the administration of justice and claim certain trial errors. Under the circumstances of this case, we decline to disturb appellants' sentences on either constitutional grounds or in the exercise of our supervisory power, and we find no merit to their claims of trial error.

## I. BACKGROUND

Lillian Perez, her son William Perez and Luis Garcia appeal from their convictions following their third trial on the same charges in the District Court for the Eastern District of New York (Nicholas Tsoucalas, Judge, Court of International Trade, sitting by designation). All three defendants were convicted of participating in a conspiracy to distribute heroin, in violation

of 21 U.S.C. § 846. Garcia was also convicted on two counts of distributing heroin, in violation of 21 U.S.C. § 841(b)(1), and acquitted on one distribution count. Judge Tsoucalas sentenced William Perez to fifteen years imprisonment; Lillian Perez to twenty years imprisonment; and Garcia to a total term of thirty-five years imprisonment. Judge John R. Bartels, who presided at their first jury trial, had sentenced William Perez to five years imprisonment and Lillian Perez and Garcia to eight year terms. Those convictions were reversed by this court because the district court dismissed a juror on the fourth day of deliberations after it appeared that the juror was holding out for an acquittal. *United States v. Hernandez*, 862 F.2d 17 (2d Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). The defendants' second convictions before Judge Joseph E. McLaughlin and a jury were set aside by that judge in the wake of *Gomez v. United States*, —— U.S. ——, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989), because a magistrate had selected the jury.

*A. The Evidence at Trial:*

The evidence at trial established Garcia and William and Lillian Perez as members of a large-scale heroin trafficking organization based in the Bushwick section of Brooklyn. Run by Miguel Hernandez, the organization moved roughly $40,000 worth of heroin a day in street-level sales between July 1985 and March 1987. The government relied on extensive documentary and testimonial evidence.

Among other witnesses, Roberta Rivera, an undercover Special Agent with the Drug Enforcement Administration ("DEA"), testified that in the spring of 1986, she began to purchase heroin from Hernandez and two members of his organization, Aurea Gonzalez and defendant Garcia. Gonzalez herself testified that she had worked as a runner for the Hernandez organization for roughly eighteen months. During that time, she transferred large amounts of heroin from a supplier to each of the appellants, who—on average—received approximately $40,000 worth of heroin a day between January and June 1986. Gonzalez also delivered heroin directly to Lillian Perez, who operated a "stash pad" at 1408 Putnam Avenue in Brooklyn. Lillian Perez also frequently collected packages of heroin worth between five and fifteen thousand dollars from Gonzalez's apartment.

Louis Figueroa, who had not testified at the first trial, testified that he had been involved in the Hernandez organization from 1984 until 1986 and described two "spots"—or drug distribution centers—run by Lillian Perez and how he would collect money from her and drop off additional packages of heroin at her apartment. He also linked, for the first time, William Perez and Garcia to a significant heroin delivery designed in part to help the Hernandez drug organization join forces with another major heroin distributor.

At trial, the government introduced numerous records and drug paraphernalia seized from the residences of Garcia, Gonzalez and Lillian Perez. Among other items, the government put before the jury thousands of dollars worth of heroin packaged for street sales; detailed narcotics records that specifically referred to each of the defendants by their street names and documented the amount of heroin they sold; scales used to weigh narcotics; devices used to seal the plastic bags that contained heroin; glassine bags; and a handgun.

*B. The Suppression Hearing:*

On November 4, 1986, the police arrested Lillian Perez in the basement of her apartment building. She was carrying a shoe box containing fifteen thousand dollars worth of heroin, which the officers seized without a warrant. Before the second trial and after a hearing, Judge McLaughlin denied her motion to suppress that evidence. At the third trial, Judge Tsoucalas adopted Judge McLaughlin's opinion, which included extensive factual findings, explicitly crediting the testimony of the arresting and seizing officers.

Four members of the New York City Police Department's Street Narcotics Enforcement Unit ("SNEU") testified to the

following at the suppression hearing. On November 4, 1986, the SNEU team—in uniform and driving marked police cars—investigated possible drug transactions near 1408 Putnam Avenue in Brooklyn, the building in which Lillian Perez had an apartment. Equipped with binoculars and a radio, one officer Kucinski took an observation point on a nearby rooftop. Based on Kucinski's observations, the other officers made two arrests. Shortly thereafter, Kucinski radioed a description of another suspected drug dealer who wore a cast on his arm. The officers on the ground and this suspected dealer then engaged in an extended cat-and-mouse chase.

The officers first drove up to 1408 Putnam just as the suspected dealer ran into the building, with the door locking behind him. The officers then drove away, only to be radioed once more that the seller was again in front of the building. The officers returned and chased the suspect, but they were similarly thwarted. A few moments later, the officers repeated their effort to apprehend the dealer. This time, the suspect left the building's door ajar, and the officers continued the chase inside. Not knowing which apartment the suspect was in, two officers went upstairs and two went into the basement. When the suspect could not be found, the upstairs officers left the building; the officers in the basement waited behind for a period that Judge McLaughlin specifically found to be between three and five minutes. Based on the testimony of the four officers, Judge McLaughlin also specifically found that, during those few minutes, the officers in the basement were still "actively pursuing a suspect who had proven remarkably evasive all evening." While this was occurring, Lillian Perez walked down a flight of stairs into the basement and into the presence of the officers, carrying with her the shoe box filled with heroin.

## II. DISCUSSION

### A. The Sentences:

Appellants attack their enhanced sentences on two fronts: first, that they violate the due process guarantee of the Fifth

Amendment, and second, that they contravene a rule adopted by this court pursuant to our supervisory power over the administration of justice. At the outset, we note that defendants' narcotics offenses were committed prior to November 1, 1987, the effective date of the Sentencing Guidelines that have transformed the federal law of sentencing.

Defendants' principal claim is that a presumption of vindictiveness, arising under the Fifth Amendment's due process guarantee, requires that their sentences be vacated because they were increased following defendants' successful appeal of their original convictions. Defendants rely on *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), and its progeny. In *Pearce*, the Supreme Court held that the due process guarantee precludes increased sentences when the increase is motivated by vindictiveness on the part of the sentencing judge, and requires, whenever a sentence is increased, that the judge affirmatively place on the record non-vindictive reasons supporting the increase. *Id.* at 725–26, 89 S.Ct. at 2080–81. Over the past two decades, however, the Supreme Court has significantly limited the application of the prophylactic rule announced in *Pearce.* In so doing, the Court has emphasized that "vindictiveness of a sentencing judge is the evil the Court sought to prevent [in *Pearce* ] rather than simply enlarged sentences after a new trial. The *Pearce* requirements thus *do not apply in every case where a convicted defendant receives a higher sentence on retrial.*" *Texas v. McCullough*, 475 U.S. 134, 138, 106 S.Ct. 976, 978, 89 L.Ed.2d 104 (1986) (emphasis added) (*Pearce* presumption inapplicable where first sentence imposed by jury and second imposed by judge).

In a variety of contexts, the Court has declined to apply the *Pearce* presumption where the underlying concern about vindictiveness is absent. *See Alabama v. Smith*, —— U.S. ——, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989) (no *Pearce* presumption when first sentence is based upon a guilty plea and second follows a trial, even where both

sentences imposed by same judge); *McCullough, supra,* 475 U.S. at 140, 106 S.Ct. at 979 (where "different sentencers assessed the varying sentences that [the defendant] received ... a sentence 'increase' cannot truly be said to have taken place."); *Chaffin v. Stynchcombe,* 412 U.S. 17, 27, 93 S.Ct. 1977, 1983, 36 L.Ed.2d 714 (1973) (*Pearce* inapplicable where second sentence was "not meted out by the same judicial authority whose handling of the prior trial was sufficiently unacceptable to have required a reversal of the conviction."). Thus, unless the court can find a "realistic motive for vindictive sentencing," *McCullough,* 475 U.S. at 139, 106 S.Ct. at 979, the *Pearce* presumption does *not* apply.

█ In this case, there is no realistic motive for vindictive sentencing. The prior reversal was based on a ruling by a judge other than Judge Tsoucalas. Thus, there can be no inference of a specific retaliatory motive on the part of the sentencing judge. *See Colten v. Kentucky,* 407 U.S. 104, 116–117, 92 S.Ct. 1953, 1960, 32 L.Ed.2d 584 (1972) ("[T]he court which ... imposed the final sentence was not the court with whose work [the defendant] was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly."). At a subsequent trial before a different judge, the evidence might well be presented in a different light, new witnesses might come forward, others might appear more credible or recite additional facts, and the judge might be impressed with items of proof that either escaped notice at the first trial or were discounted by the first trial judge. To hold otherwise "would be tantamount to presuming that a judge will be vindictive towards a defendant merely because he seeks an acquittal." *Texas v. McCullough,* 475 U.S. at 139, 106 S.Ct. at 979. Like the Supreme Court, "[w]e decline to adopt the view that the judicial temperament of our Nation's trial judges will suddenly change upon the filing of a successful post-trial motion. The presumption of *Pearce* does not apply in situations where the possibility

of vindictiveness is this speculative, particularly since the presumption may often 'operate in the absence of any proof of an improper motive and thus ... block a legitimate response to criminal conduct.' " *Id.* (quoting *United States v. Goodwin,* 457 U.S. 368, 373, 102 S.Ct. 2485, 2488, 73 L.Ed.2d 74 (1982)). We thus decline to extend the presumption of vindictiveness to the present case.

█ If the presumption does *not* apply, then the burden remains on the defendant to show actual vindictiveness upon resentencing. *Alabama v. Smith,* 109 S.Ct. at 2205. In attempting to meet this burden, appellants Lillian and William Perez rely primarily on the disparity between their sentences and those of certain of their co-defendants, who were sentenced either by Judge Bartels or Judge McLaughlin.[1] The presentence report classified the various defendants by degrees of culpability. The report classified Lillian and William Perez, along with six other co-defendants, at the third level of the organization. Those six received prison sentences ranging from two-and-a-half to six years, while, as previously noted, William Perez and Lillian Perez were sentenced to terms of fifteen and twenty years respectively. Lillian Perez also complains that Judge Tsoucalas refused to meaningfully address various mitigating factors that explain her participation in the Hernandez organization. She claims now—and asserts that she attempted to argue below—that she was involved in the Hernandez organization only briefly, and then only because she hoped to pay a $40,000 indebtedness to Hernandez, allegedly incurred as an inducement for him to cancel a murder contract that he had placed on her son William. Garcia's assertion of actual vindictiveness rests solely upon the disparity of sentences raised by the Perez appellants.

█ While this court recognizes, as did the Supreme Court in *Pearce,* 395 U.S. at 725 n. 20, 89 S.Ct. at 2080 n. 20, that it is not always easy to demonstrate actual vindictiveness, appellants fall far short of

1. Over twenty members of the Hernandez drug organization were indicted and convicted.

demonstrating any improper motivation on the part of Judge Tsoucalas. As a preliminary matter, certain of the defendants who received more lenient sentences pleaded guilty, and "the relevant sentencing information available to the judge after [a] plea will usually be considerably less than that available after a trial.... [I]n the course of the proof at trial the judge may gather a fuller appreciation of the nature and extent of the crimes charged." *Alabama v. Smith*, 109 S.Ct. at 2205–06. In addition, many factors favor relative leniency for those who acknowledge their guilt—often expressing remorse—and thus help conserve scarce judicial and prosecutorial resources for those cases that merit the scrutiny afforded by a trial. *See Brady v. United States*, 397 U.S. 742, 752, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747 (1970). Indeed, disparities in sentences among co-defendants are generally not reviewable. *United States v. Rooney*, 866 F.2d 28, 33 (2d Cir.1989); *United States v. DiStefano*, 555 F.2d 1094, 1102 (2d Cir.1977).

A disparity of sentences imposed by two different judges, after each has presided at a trial, cannot alone support a claim of actual vindictiveness, especially where, as here, the judge provided "on-the-record, wholly logical, nonvindictive reason[s] for the sentence." *McCullough*, 475 U.S. at 140, 106 S.Ct. at 980. The district judge based his sentencing of Lillian Perez on what he perceived to be her greed, her lack of remorse, the fact that she played a major role in the drug conspiracy, and the fact that, although never an addict herself, she had immersed herself and her son in the business of drugs. These were proper, non-vindictive reasons for the sentence imposed and, indeed, Lillian Perez does not even attempt to argue otherwise. Moreover, the record reveals that Judge Tsoucalas *did* consider Lillian Perez's proffered explanations for her conduct; what he did *not* do was give them much weight, reasonably noting, for instance, that the presentence report—which Lillian Perez had reviewed with her counsel, and to which she

had not objected—made no mention of the $40,000 loan or the purported contract on her son. The evidence at trial also established that the appellant made considerable profit from her participation in the conspiracy, which—presumably—could have been used to repay any outstanding indebtedness. As for William Perez, the district court stated that it deemed him a manager of a large-scale drug organization and attributed his actions, like those of his mother, to greed.

Garcia argues, in addition to actual vindictiveness based on sentencing disparity, that his sentence was mechanistically imposed and thus in violation of the Eighth Amendment. This latter claim is without merit and remains unsupported by any specific evidence. Instead, Garcia summarily argues that "[i]t is ... clear that upon the totality of the record before this Court, the sentencing of the appellant was in violation of his Eight [sic] Amendment rights and an abuse of the discretion of the sentencing judge." What Garcia ignores, however, is that Judge Tsoucalas based his sentence of Garcia upon wholly appropriate, non-vindictive considerations—such as the defendant's level of participation, his criminal history, and the fact that he was on parole when he committed the crimes—all of which the judge explained on the record at the time of sentencing. *See United States v. Gaggi*, 811 F.2d 47, 62 (2d Cir.) (sentence imposed mechanistically if court fails to base sentence on the defendant's independent participation in the relevant crimes), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).[2] Garcia also errs when he claims that he received the maximum penalty possible; in addition to imposing a twenty year sentence on the conspiracy count, Judge Tsoucalas imposed two fifteen year sentences on the substantive counts but ordered the terms on the substantive counts to run concurrently rather than consecutively.

Appellants also ask us to invalidate their sentences pursuant to our supervisory power over the administration of justice. Al-

---

**2.** To the extent that appellants William and Lillian Perez have joined Garcia in his allegation of a mechanistic imposition of sentence, their claim is similarly without merit.

though not cited, the source of this argument is our in banc decision in *United States v. Coke*, 404 F.2d 836 (2d Cir.1968) (Friendly, J.). This court issued its opinion in *Coke* shortly after the Supreme Court granted certiorari in *Pearce*, but before the *Pearce* opinion was announced. In *Coke* the defendant, like these appellants, was tried before and sentenced by different judges after separate trials. This court addressed the same issues presented by *Pearce* and reached the same conclusion, though by a different route. Where the Supreme Court held that due process mandates limits on increasing the sentence of a defendant following a successful appeal and subsequent retrial, the Second Circuit found no constitutional barrier to such a practice absent a defendant's showing of actual vindictiveness. The Second Circuit nonetheless imposed similar limits in an exercise of its supervisory power in order to combat the potential deterrent to the exercise of a convicted defendant's right to appeal. *See also United States v. Barash*, 428 F.2d 328, 332 (2d Cir.1970) ("[A]fter retrial, a sentencing judge is bound, absent the justifying circumstances set out in *Pearce* and *Coke*, to follow the kind, as well as to stay within the bounds of the degree of severity, of the punishment imposed following the first trial, unless there are extremely compelling reasons which demand a change …")

■ There is no basis to assume, as the government argues, that our supervisory authority over the administration of justice in this circuit, and over sentencing in particular, has been diminished by limitations the Supreme Court has placed on the *Pearce* presumption over the past two decades. In announcing the *Pearce* due process protection, and in modifying *Pearce* thereafter, the Supreme Court has neither precluded a circuit court from relying on its supervisory power to invalidate enhanced sentences under certain circumstances, nor even suggested that constitutional constraints are the only possible limits on a district court's discretion when resentencing a defendant following a second trial after a successful appeal. Indeed, in other contexts, the Supreme Court has affirmed

the legitimacy of a federal court's supervisory power, and its role in securing rights not guaranteed by the Constitution. *See generally United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (" '[G]uided by considerations of justice,' *McNabb v. States*, 318 U.S. 332, 341 [63 S.Ct. 608, 613, 87 L.Ed. 819] (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.").

Our task, then, is to evaluate Judge Tsoucalas' reasons for enhancing the sentences previously imposed in light of this court's decisions in *Coke* and *Barash*. We first repeat that we find no evidence whatsoever of an improper motivation, let alone vindictiveness, on the part of Judge Tsoucalas, just as we found no improper motivation on the part of the district courts in *Coke* or *Barash*. *See Barash*, 428 F.2d at 330; *Coke*, 404 F.2d at 842. Those cases rested not on any vindictiveness, presumed or actual, but rather on "the important interest that appeals not be deterred." *Coke*, 404 F.2d at 846.

In *Coke*, the court envisioned at least three possible scenarios that could lead to an increased sentence following re-trial: first, where the defendant engages in objectionable conduct after the initial sentence; second, where new evidence or testimony surfaces at the second trial and thus had been unavailable to the original sentencing judge, a situation that might occur "where evidence previously unavailable to the prosecution shows that the defendant instead of being a minor cog was the mastermind," *Coke*, 404 F.2d at 843; and third, where the second sentencing judge simply thought the initial sentence too lenient. The first two scenarios would justify a sentence enhancement, notwithstanding a potential chill in the exercise of the right to appeal; the third scenario would not. *Id.* at 846.

■ Although neither the district court nor the parties here considered *Coke* or *Barash* at sentencing, the district court did place on the record reasons sufficient to

satisfy the rule set forth in those cases. To justify the ten and twenty-seven year increases in the sentences of William Perez and Garcia, the court relied both on the testimony of Louis Figueroa, the government informant who had not testified at the first trial, and on physical evidence of an additional seizure of glassine bags. Figueroa depicted a heroin enterprise of considerably larger scope than previously understood, and the two defendants' roles therein. He linked Perez and Garcia for the first time to a $10,000 heroin delivery which was part of an effort by the Hernandez organization to join forces with the Santos organization, another major heroin distributor.

Figueroa's testimony also justified the enhancement of Lillian Perez's sentence. As a co-conspirator, she bears responsibility for the full extent of her own and her co-conspirators' activities, including their attempted joinder with the Santos organization brought to light by Figueroa. In addition, Figueroa testified that Lillian Perez had operated two "stash" pads simultaneously, one at 1408 Putnam Avenue—where she was arrested carrying the shoe box filled with heroin—and the other at 1271 Decatur Avenue. Appellant argues that Figueroa's testimony cannot be seen as "new" because the same assertions were contained in the presentence report available to Judge Bartels prior to the first sentence. However, the presentence report included references to the two "stash" pads only as hearsay. A material difference exists between hearsay allegations contained in a presentence report and the live trial testimony of a witness, who—in this case—provided direct, detailed testimony regarding the two locations, who showed where Lillian Perez's name appeared on the books that were seized from both of the addresses, and whose credibility was evaluated fully by the trial judge.

We are satisfied that Figueroa's testimony in this case justified the enhanced sentences of all three defendants. This is not a case where the government, on retrial, padded the record with repetitive or superficial evidence. As the district court noted, Figueroa was not merely a cumulative witness who repeated testimony already in the record. Nor can the district court's reliance on Figueroa be dismissed as merely a pretext for the enhanced sentences. And while Judge Tsoucalas expressed misgivings about Figueroa's character—not surprising, given the witness's past criminal history—he clearly credited Figueroa's testimony. We conclude that Figueroa's testimony justified the enhancements even though it is possible that Figueroa was available to testify at the first trial, although given his status as a confidential informant, it is far from clear that he was. A defendant, perhaps better than anyone else, knows the extent of his participation in the crimes charged; it is not improper for him to consider, when deciding whether to take an appeal, the possibility that more damaging testimony will be offered at a subsequent trial. *See Coke*, 404 F.2d at 846 ("While it is entirely true that 'the danger that the government may succeed in obtaining more damaging evidence on a retrial is just as real as the danger, for example, that the judge on his own may wish to reconsider ... the factors which led to his original disposition,' we do not see why the former danger is one against which the defendant is entitled to protection.") (citation omitted).

Finally, prior to the imposition of sentence, Lillian Perez for the first time attempted to explain her participation in the conspiracy as a product of her fear "for my child because they were going to kill him." As we have noted, this purported explanation surfaced for the first time at the sentencing proceeding that followed the third trial. It was not in the presentence report, and Judge Tsoucalas reasonably rejected the explanation as a self-serving, disingenuous plea for leniency. Figueroa's testimony about the more expansive nature of the overall conspiracy, his testimony about Lillian Perez's direct involvement in the operation of two "stash" pads, and Perez's own attempts to mislead the trial judge taken together justify the enhanced sentence she received.

 While we uphold the sentences imposed, we note that *Coke* remains undis-

turbed by the Supreme Court. Unless the Supreme Court alters the scope of this court's supervisory power over the district courts in this area, or until this court revisits the issue in banc, *Coke* remains the law of the circuit for sentences imposed in cases not subject to the Sentencing Guidelines. Thus, in pre-Guidelines cases, when resentencing a defendant after a successful appeal of the defendant's prior conviction, a district court must stay within the bounds of the punishment imposed following the first conviction, unless there are compelling reasons which demand a more severe penalty. Factors that might justify such a sentence enhancement include, but are not limited to, significant new evidence that was not presented at the original trial or was not otherwise available to the first sentencer, or identifiable conduct on the part of the defendant occurring after the original sentencing proceeding that would support a sentence enhancement. We have no reason to consider, and thus leave for another day, an examination of how the enactment of the Sentencing Guidelines may have affected not only *Pearce* and its progeny but also *Coke.*

## B. Exigent Circumstances and the Motion to Suppress:

Defendants next challenge the warrantless search of Lillian Perez's apartment building at 1408 Putnam Avenue. We must determine whether exigent circumstances lay behind the officers' warrantless entry into the Putnam Avenue building, and their waiting in the basement that led to the seizure of heroin in the possession of Lillian Perez. Under the Fourth Amendment, and in the absence of consent, " 'a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show ... the presence of "exigent circumstances." ' " *Welch v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971)). A heavy burden remains on the government "to demonstrate exigent circumstances that overcome the presumption of unreasonableness that at-

taches to all warrantless home entries." *Welsh,* 466 U.S. at 750, 104 S.Ct. at 2098. The Supreme Court has found the burden of establishing exigent circumstances satisfied where the law enforcement officers have been in pursuit of a fleeing felon whose arrest was first attempted in public. *See United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976); *United States v. Martinez–Gonzalez,* 686 F.2d 93, 100–02 (2d Cir. 1982).

In such an inquiry, we look to such factors as

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed,* 572 F.2d 412, 424 (2d Cir.) (quoting *Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970) (en banc)), *cert. denied,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). This list of factors "is illustrative, not exclusive; other factors may be relevant." *United States v. Martinez–Gonzalez,* 686 F.2d at 100. Moreover, "[t]he presence or absence of any one factor is not conclusive." *United States v. Crespo,* 834 F.2d 267, 270 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). Before we uphold a warrantless entry pursuant to the exigent circumstances exception, we must be satisfied that the district court record included evidence of facts that made it objectively reasonable for the law enforcement officers to believe that time was of the essence.

We conclude that the district court's factual findings in support of exigent circumstances in this case were not clearly erroneous. After holding an extensive hearing, at which four officers testified, Judge McLaughlin—in an opinion la-

ter adopted by Judge Tsoucalas—found that each *Reed* factor supported a finding of exigent circumstances in the officers' pursuit of the suspect with a cast on his arm, a finding that appellants do not challenge. Instead, they challenge the district court's conclusion that those exigent circumstances still existed at the time that the officers apprehended Lillian Perez with the shoe box containing heroin.

Explicitly crediting the officers' testimony and rejecting that offered by a defense witness, Judge McLaughlin determined that the two officers remained in the basement for only three or, at most, five minutes after their initial failure to apprehend the suspect with the cast on his arm. We are unprepared to say that law enforcement officers, after making a legitimate warrantless entry, must abandon the premises within three to five minutes where, as here, those officers have engaged in an extended chase after a suspect who, as Judge McLaughlin explained, "had proven remarkably evasive all evening." No basis exists to deem Judge McLaughlin's conclusion clearly erroneous. Appellants place great weight on the testimony of one officer who used the term "stakeout" to describe the officers' presence in the basement. We, of course, are not bound by one witness's choice of words. Indeed, Judge McLaughlin rejected that description, finding that the officers "did not convert the search in the basement for the suspect [with the cast on his arm] into some kind of stakeout merely by remaining on the premises several minutes." The district court's rejection of the term "stakeout" was not clearly erroneous and falls far short from establishing, as appellants contend, a "continuing the investigation" exception to the warrant requirement. *Cf. United States v. Agapito*, 620 F.2d 324, 337 n. 20 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

▮▮▮▮▮ We have examined appellants' remaining contentions and find them without merit.[3]

## III. CONCLUSION

We find no merit in appellants' challenges to their convictions, which are thus affirmed in all respects. Under the circumstances of this case, we find that the enhanced sentences of appellants William and Lillian Perez and Garcia do not violate their constitutional right to due process. We also find that the district court's stated reasons for the increased punishments of each appellant satisfy the dictates of the rule announced pursuant to our supervisory authority over the administration of justice.

**3.** Lillian Perez contends that a red ledger kept by government witness Gonzalez implicating Perez was improperly admitted at trial. Our review of the trial transcripts, and not appellant's selective reliance on that record, convinces us that the ledger was properly admitted as a business record pursuant to Fed.R.Evid. 803(6). Appellant Garcia's contention that he was denied effective assistance of counsel is frivolous. His claim that his trial counsel examined a single government witness without an index to the so-called 3500 material provided by the government comes nowhere near meeting the standard articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires both that the attorney's conduct fell below an objective standard of reasonableness, and that but for this deficient conduct the trial's outcome would have been different. Garcia fails to explain how the absence of such an index was either a lapse or prejudicial.

Finally, Garcia contends that he was deprived of his Sixth Amendment right to counsel of his choice when the district court denied his request two days before jury selection to substitute counsel without first holding a formal hearing. When the district court afforded Garcia an opportunity to explain why he wanted new counsel, Garcia contended only that his counsel "says everything all backwards." Garcia had not expressed any difficulty in communicating with the same counsel at his previous two trials or throughout the pretrial period before his third. No further explanation for his request is advanced on appeal. In these circumstances, no hearing was required. *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir.1981), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982) ("[A] defendant seeking substitution of assigned counsel must ... afford the court with legitimate reasons for the lack of confidence.").