**UNITED STATES of America,**
**Plaintiff–Appellee,**

**Charles M. CARBERRY, Esq.**
**and Frederick B. Lacey,**
**Esq., Appellees,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, AFL–CIO; The Commission of La Cosa Nostra; Anthony Salerno, also known as Fat Tony; Matthew Ianniello, also known as Matty The Horse; Nunzio Provenzano, also known as Nunzi Pro; Anthony Corallo, also known as Tony Ducks; Salvatore Santoro, also known as Tom Mix; Christopher Furnari, Sr., also known as Christie Tick; Frank Manzo; Carmine Persico, also known as Junior, also known as The Snake; Gennaro Langella, also known as Gerry Lang; Philip Rastelli, also known as Rusty; Nicholas Marangello, also known as Nicky Glasses; Joseph Massino, also known as Joey Messina; Anthony Ficarotta, also known as Figgy; Eugene Boffa, Sr.; Francis Sheeran; Milton Rockman, also known as Maishe; John Tronolone, also known as Peanuts; Joseph John Aiuppa, also known as Joey O'Brien, also known as Joe Doves, also known as Joey Aiuppa; John Phillip Cerone, also known as Jackie the Lackie, also known as Jackie Cerone; Joseph Lombardo, also known as Joey the Clown; Angelo LaPietra, also known as The Nutcracker; Frank Balistrieri, also known as Mr. B; Carl Angelo Deluna, also known as Toughy; Carl Civella, also known as Corky; Anthony Thomas Civella, also known as Tony Ripe; General Executive Board, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Jackie Presser, General President; Weldon Mathis, General Secretary–Treasurer; Joseph Trerotola, also known as Joey T., First Vice President; Robert Holmes, Sr., Second Vice President; William J. McCarthy, Third Vice**

President; Joseph W. Morgan, Fourth Vice President; Edward M. Lawson, Fifth Vice President; Arnold Weinmeister, Sixth Vice President; John H. Cleveland, Seventh Vice President; Maurice R. Schurr, Eighth Vice President; Donald Peters, Ninth Vice President; Walter J. Shea, Tenth Vice President; Harold Friedman, Eleventh Vice President; Jack D. Cox, Twelfth Vice President; Don L. West, Thirteenth Vice President; Michael J. Riley, Fourteenth Vice President; Theodore Cozza, Fifteenth Vice President; Daniel Ligurotis, Sixteenth Vice President; and Salvatore Provenzano, also known as Sammy Pro, Former Vice President, Defendants,

Robert C. Sansone, Appellant.

No. 262, Docket 92–6140.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 1992.

Decided Dec. 22, 1992.

Cary Hammond, St. Louis, MO (Diekemper, Hammond, Shinners, Turcotte and Larrew, P.C., St. Louis, MO, of counsel), for appellant.

Steven C. Bennett, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Gabriel W. Gorenstein, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Charles M. Carberry, New York City, for appellee.

John F. Nangle Jr., Nangle, Cooper, Nieman & Bitting, P.C., St. Louis, MO, Franklin K. Moss, Spivak, Lipton, Watanabe, Spivak & Moss, New York City, submitted an amici curiae brief for Various International, Intermediate, and Local Labor Organizations.

David G. Millar, Michael Bobroff, St. Louis, MO, Franklin K. Moss, Spivak, Lipton, Watanabe, Spivak & Moss, New York City, submitted an amici curiae brief for Associated General Contractors of St. Louis and Site Improvement Ass'n.

Jeffrey E. Hartnett, Barkley, Goffstein, Ballato & Lanse, Mark W. Weisman, Suelthaus & Kaplan, P.C., Robert B. Vining, Sr., Vining & Meyer, P.C., St. Louis, MO, Franklin K. Moss, Spivak, Lipton, Watanabe, Spivak & Moss, New York City, submitted an amicus curiae brief for the Bar Ass'n of Metropolitan St. Louis.

Before: MESKILL, Chief Judge, OAKES and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Robert C. Sansone ("Sansone") is the former President of International Brotherhood of Teamsters ("IBT") Local 682, headquartered in St. Louis, Missouri. Besides serving as President of Local 682, Sansone was also the President of Joint Council 13, President of the Missouri–Kansas Conference of Teamsters, and an International Representative. He asks us to review an order of the United States District Court for the Southern District of New York (David N. Edelstein, *Judge*), upholding disciplinary sanctions imposed on him. *See United States v. International Bhd. of Teamsters*, 792 F.Supp. 1346 (S.D.N.Y.1992) ("*Sansone I*"). For the reasons set forth below, we affirm the order of the district court.

## BACKGROUND

The volume of our decisions arising from the Teamsters Litigation has already been chronicled. *See United States v. International Bhd. of Teamsters (Parise)*, 970 F.2d 1132, 1134 (2d Cir.1992) ("The case law within our circuit swells with decisions emanating from the Teamsters Litigation."). "Our earlier decisions exhaustively discuss the genesis of the Consent Decree settling the government's charges against the IBT and its officials." *Id.; see United States v. International Bhd. of Teamsters*, 931 F.2d 177, 180–81 (2d Cir.1991); *United States v. International Bhd. of Teamsters (Friedman & Hughes)*, 905 F.2d 610, 612–13 (2d Cir.1990). We recount, therefore, only those provisions of the Consent Decree necessary to understand today's dispute.

The Consent Decree provides for the appointment of an Investigations Officer and an Independent Administrator. The Investigations Officer, an appellee here, investigates and brings disciplinary charges against allegedly corrupt IBT members. The Independent Administrator then conducts hearings on the charges, and determines whether sanctions are warranted. The Consent Decree provides that the decisions of the Independent Administrator are reviewed by the district court.

On September 27, 1991, the Investigations Officer served a charge on Sansone accusing him of bringing reproach upon the IBT, in violation of the IBT Constitution, by "willfully disregard[ing his] fiduciary duty to investigate and to act with respect to allegations and evidence that Anthony Parrino, [the former] Vice President of Local 682, was a member of La Cosa Nostra ["LCN"] and associated with members of La Cosa Nostra." The burden of the charge was that Sansone's failure to investigate and act constituted a breach of his

fiduciary duty to the IBT because Parrino had already been identified as a member of organized crime by the media and other sources available to Sansone.

A hearing on the charge against Sansone was conducted by the Independent Administrator in St. Louis on November 20 and 21, 1991. At that hearing, evidence was introduced regarding Anthony Parrino's LCN membership, Sansone's knowledge of Parrino's criminal associations, and Sansone's failure to respond adequately to those allegations.

## A. PARRINO'S CONNECTIONS TO ORGANIZED CRIME

### 1. Media Coverage

The Investigations Officer introduced a collection of newspaper articles linking Parrino to organized crime. This evidence showed that as early as 1980, reports began to appear in St. Louis newspapers linking Parrino with the St. Louis crime family of boss Anthony Giordano, who died in late 1980.

On December 28, 1980, a St. Louis Post Dispatch (the "Dispatch") article reported that Parrino had met with St. Louis mafia leaders ten days before Giordano's death to discuss the selection of a successor. The article stated that Parrino "often is seen in the company of top hoodlums."

An April 26, 1981 article in the same newspaper reported that Parrino was being groomed for leadership by John J. Vitale, reputedly a powerful member of the Giordano family. The article explicitly identified Parrino as a Local 682 official, and reported that "Parrino is seen ... frequently in Vitale's company and that Parrino does many of Vitale's jobs for him."

On June 7, 1982, the Dispatch, referring to its earlier coverage, printed that: "[i]t was then reported that Anthony Parrino, an officer of Teamsters' Local 682, was in line for the role of boss. But this apparently also has not come about." On June 27, 1982, the paper again reported that Parrino "did not want" an LCN leadership position. On November 5, 1982, a front-page article in the Dispatch identified Parrino as one of the "made guys" targeted by the FBI in an investigation of the St. Louis crime family and "a high-ranking member of the St. Louis organized crime family of the late Anthony Giordano."

The media coverage waned until February 27, 1986, when a Dispatch article on the gambling prosecution of Matthew Trupiano, who had assumed leadership in the Giordano family, identified Parrino as a "Vice President of Teamster Local 682 and a longtime associate of organized crime figures." Then, an April 3, 1986, front-page article in the Dispatch on the Trupiano prosecution, trumpeted a three-hour discussion of "organized crime in St. Louis" among Parrino, Trupiano, and Vincenzo "Jimmy" Giammanco, that the government had taped surreptitiously. The article described Parrino as an official of Local 682, and also noted the court-filing of a pre-sentencing memorandum describing the taped conversation. The next day, April 4, 1986, another article appeared in the Dispatch that mentioned Parrino by name in discussing the same memorandum. On July 11, 1986, an article in the St. Louis Globe Democrat quoted from another surreptitiously tape-recorded conversation played at the Trupiano trial; the conversation identified Parrino as the "consigliere," or advisor, of the Giordano crime family.

On February 19, 1988, the Dispatch published an article alleging that three St. Louis-area labor unions, including Local 682, had contracts with an employer that paid less than union scale wages to union members. The article further reported that all three of the unions were, to varying degrees, controlled by organized crime.

Finally galvanized, Sansone wrote to the Dispatch reporter responsible for the February 19 story, denying the charges vehemently. He demanded to know what facts the article was based on, and stated that he was investigating the situation and would remedy any failure to pay members union-scale wages. The Dispatch subsequently printed another article describing Sansone as "incensed" by the allegation that Local 682 was controlled by organized crime. In

large part, the article consisted of verbatim excerpts from Sansone's letter.

### 2. *Other Evidence*

The Investigations Officer also introduced the sworn deposition testimony of Sansone himself, taken on March 20, 1991, in which Sansone testified that in 1989 he had received copies of statements from former IBT President Jackie Presser's FBI informant file. These statements included allegations that Parrino was "connected" to the St. Louis family, and that Sansone answered up to Parrino. In his deposition testimony, Sansone also stated that while he did discuss the Parrino matter at union executive board meetings, he never discussed it with Local 682's general membership. The Investigations Officer called former Local 682 member James A. Lysell to rebut that assertion. Lysell testified that, contrary to Sansone's testimony, the members had indeed asked Sansone about Parrino's crime ties at a general membership meeting in 1981 or 1982 and that Sansone told the membership that he had no control over Parrino's private life.

### B. SANSONE'S RESPONSE TO THE ALLEGATIONS

At the hearing, Sansone sought to demonstrate that he had responded appropriately to the allegations against Parrino. Sansone testified. And he called four witnesses: (1) Clyde Craig, Local 682's outside counsel; (2) Gerry Miller, an attorney retained by Sansone in 1989; (3) Benjamin Bond, Local 682's Secretary–Treasurer at the time of the hearing; and (4) Daniel Flaherty, a former Secret Service agent.

Craig testified that he advised Sansone in 1981 or 1982, and again in 1986, that the newspaper reports linking Parrino to organized crime were unreliable. Sansone testified that he responded to the reports by asking Parrino in 1981 or 1982, and again in 1986, whether he was involved with the unsavory characters mentioned in the arti-

cles; and that Parrino responded by denying anything more than a social relationship with the reputed mobsters. Sansone further testified that on neither occasion did he pursue the matter any further with Parrino and cautioned him to be careful about the people with whom he associated.

Sansone and Craig testified that, twice in 1986, Sansone met with Local 682's executive board to discuss the allegations against Parrino. Sansone responded to the Lysell testimony by directly contradicting his own deposition testimony, and now admitting that the issue had been discussed at membership meetings. He disputed Lysell's testimony only by contending that he, Sansone, had voluntarily raised the Parrino matter.[1] Sansone admitted receiving the Presser allegations in 1989, but denied that he "answered up" to Parrino, and stated that Craig had advised him that nothing could be done about the allegations. Sansone also testified that he thought the reference to Parrino in the Presser material was "ridiculous."

Sansone also offered evidence that in November 1989, after the entry of the Consent Decree and on Craig's advice, he retained Miller, an attorney experienced in IBT matters, to analyze the issue and furnish an opinion. Sansone contends that Miller was retained to give Sansone a "definite answer" concerning his responsibilities regarding the Parrino allegations and to give him "definite direction about what I should do about Tony Parrino."

The Investigations Officer, on the other hand, counters that Miller was retained "to determine the odds that Sansone would come to the attention of court officers and be charged for continuing to harbor Parrino on the Local's executive board." As support for his argument that Sansone did not want Miller to investigate the allegations against Parrino, the Investigations Officer noted that Miller was given only two of the numerous newspaper articles that had been written about Parrino. Because those articles were from 1981 and

---

**1.** To corroborate his testimony, Sansone called Bond, who testified that the issue of Parrino's crime ties was routinely discussed at membership meetings "basically every time the articles surfaced or came out." According to Bond, Sansone "would bring it to the membership first, and then they would ask questions from the floor."

1982, they contained no reference to the taped conversations and the pre-sentencing memorandum that appeared in the 1986 articles.

The Independent Administrator concluded that: "[i]t is not clear what exactly Sansone expected Miller to analyze," but found that the opinion letter Miller ultimately issued on January 7, 1990, "focus[ed] on the issue of Sansone's liability for 'knowingly associating' with Parrino, given Parrino's ties to organized crime." The opinion letter was ambivalent on this issue, stating that: "[W]e are in no position to provide a legal opinion that Local 682 officials can safely continue on-the-job associations with the local union officer in question."

On January 16, 1990, nine days after Miller had issued his opinion letter to Sansone, the two men met with Parrino to discuss whether Parrino should resign. Parrino insisted that he had not done anything wrong, and did not believe that he should have to resign. Sansone then met privately with Parrino. Parrino argued that he had been loyal to Sansone and that he would not force Sansone to resign if their positions were reversed. Sansone testified that he ultimately decided to take no action against Parrino because he believed that the Miller legal opinion was too inconclusive, that the newspaper articles lacked credibility, and because firing Parrino would be unfair.

Finally, Sansone called Daniel E. Flaherty, a private investigator and former Secret Service agent. Flaherty outlined what he would have done to investigate Parrino if Sansone had retained him to do so. The testimony he gave was inconclusive, in part endorsing Sansone's conduct, but conceding the availability of surveillance and polygraph testing, which were not used, and also acknowledging that it would have been

**2.** The charges against Parrino were formally resolved by agreement on June 11, 1991. In the agreement, Parrino neither admitted nor denied guilt, but did agree that, in addition to resigning, he would not accept employment in any IBT entities ever again.

**3.** Specifically the Independent Administrator indicated that:
Sansone could have sought assistance from the authorities; could have obtained the pub-

a simple matter to procure the court memorandum that was mentioned in the April 3, 1986 *Dispatch* article, a memorandum that Sansone did not even attempt to retrieve.

## C. THE INVESTIGATIONS OFFICER'S CHARGE AGAINST PARRINO

On March 13, 1991, Parrino was charged by the Investigations Officer with being a member of LCN while he was an officer of Local 682, and with knowingly associating with members of LCN, including Matthew Trupiano, Anthony Giordano, Vincenzo Giammanco, and John Vitale. The next day, Craig informed Sansone of the charge against Parrino, advising him to "take action." Craig, Sansone, and Parrino met on March 15. Parrino immediately resigned.[2]

## D. THE INDEPENDENT ADMINISTRATOR'S DECISION

On March 30, 1992, the Independent Administrator issued a 21-page opinion concluding that there was "just cause to show that Sansone breached his fiduciary duties to IBT members and brought reproach upon the IBT by failing to investigate and act on reports of Parrino's involvement with the St. Louis crime family." The Independent Administrator listed a number of investigatory steps that Sansone failed to take, stating that "[t]he point of all these suggestions is not that any one or more of them is an essential element of the proper discharge of Sansone's duty to investigate, but rather that reasonable means of investigation were available."[3]

Sansone had argued that his alleged failure to investigate fully the allegations against Parrino was the result of his reliance on the advice of counsel, and that such reliance should serve as a complete defense to the charge. The Independent Administrator rejected this defense, finding that Sansone:

licly filed Trupiano sentencing memorandum, or even the tape recording to which it refers; could have arranged a polygraph test or an indepth interview of Parrino by a trained professional; could have hired a private investigator; or could have asked his advisors to investigate and develop the facts of the case for his review.

did not solicit, nor did he receive any advice relevant to the issue of his duty to investigate and act in response to the allegations of Parrino's organized crime ties. Moreover, no expertise, legal or otherwise, is required to understand that a member of organized crime would not belong on the executive board of a labor union.

The Independent Administrator concluded that "[b]y his failure to act, Sansone has proven that he is not fit to serve in any officer or representative positions in the IBT or any of its" affiliates. Accordingly, he removed Sansone from all of his IBT-affiliated officer positions. He also permanently barred Sansone from: (1) ever holding any IBT officership in the future; (2) any employment with Local 682, Joint Council 13, the Missouri–Kansas Conference of Teamsters, or the International; and (3) any employment with any IBT-affiliated entity without prior approval of the Independent Administrator.

Sansone then sought review of the Independent Administrator's decision in the district court. On May 15, 1992, the district court issued an order affirming the Independent Administrator's decision in all respects. Sansone now appeals.

## DISCUSSION

Sansone argues that the district court erred in affirming: (1) the Independent Administrator's decision that Sansone willfully breached his fiduciary duty to the union; (2) the Independent Administrator's rejection of Sansone's advice-of-counsel defense; and (3) the penalty imposed by the Independent Administrator.

■ We have previously held that "[t]he district court must give 'great deference' to the decisions of the Independent Administrator." *Parise*, 970 F.2d at 1137. (quoting *Friedman & Hughes*, 905 F.2d at 616–17). Consistent with that mandate, the district court reviewed the Independent Administrator's decision to determine if it was arbitrary or capricious. *Sansone I*, 792 F.Supp. at 1352.

As we recently noted in *Parise*, "[o]ur standard of review is not so clearly defined.... [T]he Consent Decree offers no explicit guidance." *Parise*, 970 F.2d at 1137 (citing *United States v. International Bhd. of Teamsters (Cimino)*, 964 F.2d 1308 (2d Cir.1992)). In *Cimino*, we eschewed any attempt to extract a precise standard of appellate review from the Consent Decree, and noted that we may affirm a district court decision that is supportable under "any reasonable standard of review." *Cimino*, 964 F.2d at 1311 (citing *Friedman & Hughes*, 905 F.2d at 616–17). Similarly, in *Parise*, we upheld a district court decision that "fell within the realm of reason." 970 F.2d at 1137. Because the decision of the district court under review here lies safely within that realm, we once again leave the question of the precise standard of appellate review for another day.

*Sansone's Fiduciary Duty to Investigate*

Sansone's first argument on appeal is that the evidence did not support the Independent Administrator's decision and that, to the contrary, it showed that he conducted an adequate investigation into the Parrino matter. We disagree.

Every IBT "officer is a fiduciary with respect to the Union members," and has "a duty to disclose and remedy wrongdoing by the IBT." *United States v. International Bhd. of Teamsters*, 708 F.Supp. 1388, 1401 (S.D.N.Y.1989). IBT officials who have breached their fiduciary duties and violated the IBT Constitution by failing to investigate and to act upon allegations of corruption in their midst have been sanctioned by the Independent Administrator. *See United States v. International Bhd. of Teamsters (Yager)*, 761 F.Supp. 315, 318 (S.D.N.Y.1991); *United States v. International Bhd. of Teamsters (Calagna)*, No. 88 Civ. 4486, 1991 WL 243292 (S.D.N.Y. Nov. 8, 1991).

■ Sansone does not dispute that he was aware of the allegations in the media and elsewhere of Parrino's connection to organized crime; nor does he dispute that he had a duty to investigate and act upon the allegations against Parrino. Rather, he

contends that there was no "willful" and "deliberate" breach of that duty, as alleged in the charge against him, because he did take certain steps, however minimal, that could be characterized as "investigation."

Sansone's argument rings hollow, if only because it deprecates the "duty to act" in the context of this case. The charge against Sansone alleged that he breached his fiduciary duty and constitutional oath to the IBT by failing to investigate and act upon very specific, numerous, and continuous allegations that Anthony Parrino was significantly involved in organized crime. Prominent articles in St. Louis's leading newspapers made specific statements about Parrino's association with reputed LCN members, and also described explicitly the precise role that Parrino was believed to play in the organization. Indeed, Sansone readily acknowledged in his testimony at the hearing that Parrino had admitted friendships with alleged underworld operatives. Sansone was also privy to a report from no less a source than the former President of the entire Union, Jackie Presser, who opined that Parrino was associated with the LCN and that Parrino wielded great authority over Sansone.

In light of this overwhelming evidence linking Parrino to the seedy underworld elements that had leeched off the blood of the rank-and-file members of the IBT through decades of manipulation—a bloodletting that was only stanched by the entry of the Consent Decree and the safeguards it imposed—we think it is evident that the "investigation" Sansone conducted was utterly inadequate.

The Independent Administrator found that the sum total of Sansone's response to almost a decade of allegations against Parrino was to: (1) ask Parrino twice if the rumors were true, once after the 1981–82 wave of newspaper reports, and again after the 1986 reports; (2) discuss the matter with Local 682 lawyer Clyde Craig, who characterized the media coverage of Parri-

no as unreliable; (3) solicit, after the issuance of the Consent Decree, Miller's advice regarding Sansone's potential personal liability arising out of his relationship with Parrino; (4) meet with Parrino in 1990 to discuss the allegations; and (5) discuss the Parrino matter within the union.

These actions, even collectively, do not represent a serious attempt to investigate or inquire into the allegations. Sansone's discussions with Craig, by Sansone's own account, centered on what disciplinary actions could be taken against Parrino in light of the newspaper allegations; at no time did they discuss the more obvious question of whether those allegations were true, leaving the issue of sanctions to await the outcome of a thorough investigation.

Similarly, Sansone's retention of Miller to issue an opinion letter analyzing Sansone's exposure based on his relationship with Parrino cannot be seriously characterized as an attempt to investigate Parrino when it is remembered that Sansone's agents did not even furnish Miller with all the evidence they knew existed, and Miller's research focussed almost exclusively on the extent of the government's information regarding Parrino.[4] That Miller was not hired to investigate Parrino's organized crime ties was underscored by the very first paragraph of Miller's letter to Sansone, in which Miller described his assignment as follows:

> You have asked us to investigate and provide a legal opinion concerning the legal ramifications under the consent decree in *USA v. IBT* of on-the-job contacts with a fellow local union officer and employee that the court-appointed officers may allege to have or have had La Cosa Nostra ties.

Sansone does not seriously contend that his discussions with the Local's executive board or membership constituted an investigation, but points to it as evidence that Parrino was not shown any favoritism, and

---

4. As the Miller opinion letter indicated:
   The crux of the matter is that our investigation clearly suggests that the Government, and therefore now the Investigations Officer, has a file on the Local 682 officer which contains,

at a minimum, the materials we have attached to this memorandum. The legal question then becomes what degree of exposure, if any, exists to Local 682 and its other officers by reason of these facts.

that Sansone was fully forthcoming with his membership. Whatever the merits of that contention, it is not persuasive evidence that Sansone adequately discharged his obligation to act in response to the allegations against Parrino, particularly where Sansone's testimony regarding his discussions with the membership was inconsistent.

The only actions that Sansone took that were remotely "investigatory" were the two occasions when he benignly questioned Parrino about the media allegations of Parrino's underworld activities (and immediately accepted his denials) and the 1990 meeting when Parrino again denied any wrongdoing, and after which Sansone declined to fire Parrino. Given Parrino's obvious motivation to deny the allegations, the perfunctory nature of the sessions, and the lack of any other investigative conduct on Sansone's part, we conclude that the Independent Administrator's decision that Sansone breached his fiduciary duty to the Union by failing to act in response to the allegations regarding Parrino was neither arbitrary nor capricious.

██ In reaching this conclusion, we reject Sansone's assertion that the minimal actions he took were sufficient to discharge his duty to investigate.. The extent of the duty to investigate and act on allegations of corruption must be measured by the magnitude of the evidence and the importance of the allegations of corruption. By that scale Sansone's "investigation" is seriously wanting.

*The Advice-of-Counsel Defense*

██ Sansone also argues that, even if his actions might have constituted a breach of his fiduciary duty under ordinary circumstances, they did not in this case because all his decisions relating to Parrino were made in reliance upon the advice of counsel. Specifically, he claims that because he asked Craig after the 1982 and

1986 waves of media coverage what could be done to Parrino and because he hired Miller to prepare an opinion letter on the legal ramifications of the Parrino–Sansone relationship, his failure to act cannot be labelled willful.

This argument is fundamentally flawed. To the extent that Sansone's brief, informal, and relatively vague conversations with Craig can be characterized as good faith efforts to seek legal advice, it is clear that the only matter considered during those conversations was whether disciplinary actions could be taken against Parrino on the basis of newspaper reports alone.[5] Sansone never solicited, nor did Craig ever volunteer, any information regarding Sansone's obligation to dig deeper into the charges. Because Sansone neither sought nor received Craig's advice regarding a possible investigation of Parrino, any conversations he did have with Craig cannot serve as a defense to a charge that he failed to investigate.

Sansone's reliance on his retention of Miller is unavailing, on largely the same ground. Sansone never requested, nor did Miller conduct, an investigation into Parrino's putative underworld connections or activities. Because the advice solicited and received from Miller, like that from Craig, did not address the charge that was brought against Sansone, the Independent Administrator properly rejected the advice-of-counsel defense as factually unsupported.

*The Penalty*

Sansone's final challenge is to the penalty imposed on him. He assails it as arbitrary and capricious, not based on just cause, and a violation of due process. Although this challenge is Sansone's most persuasive, we are, in the final analysis, constrained to reject it.

Claiming that the Independent Administrator based the penalty, at least in part, on

5. At the hearing, Sansone testified that following the 1982 articles he "asked Clyde, I said, 'Clyde, is there anything I can do?' And Clyde advised me, he says, 'Bobby,' he says, 'I've read the articles,' and he says, 'there's no concrete proof,' he says, 'No, not on a newspaper article,' and I didn't do anything." Sansone also testified that after the 1986 articles, Craig "said again there was no concrete evidence other than the newspaper articles, and so no action was taken at that time."

the fact that Sansone mounted a defense to the Investigations Officer's charge; Sansone contends that his due process rights were violated and that the penalty was not based on just cause.[6] Specifically, he points to the following language from the Independent Administrator's decision:

In evaluating what penalty to impose, I am not unmindful that responsible public figures in the St. Louis area, as well a Local 682 members and retirees, think highly of Sansone. Balanced against this, however, is the fact made obvious by Sansone's defense of these charges, that he still does not accept, even in principle, the idea that he was or is obligated to investigate and act against signs of mob influence in his union.

Sansone contends that this language betrays a hostility to Sansone's right to present a defense that is at war with elementary notions of just cause and due process.

We reject this interpretation. The quoted language does not impugn Sansone's right to present a defense, but merely states that the *nature* of the defense that Sansone chose to mount indicated an alarming, continuing, and conscious failure to recognize his duty to investigate. That is a proper consideration in imposing a penalty. *Cf. United States v. Perez*, 904 F.2d 142, 147 (2d Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 270, 112 L.Ed.2d 226 (1990) (lack of remorse is a proper consideration in sentencing).

■ Sansone also asserts that the Independent Administrator's attack on his defense in imposing punishment violated the constitutional guaranty of due process.

We reject this argument for two reasons: (1) it is based on the same distorted construction of the Independent Administrator's decision as his just cause argument; and (2) in any case, the acts of the Independent Administrator do not constitute "state action." *United States v. International Bhd. of Teamsters (Senese )*, 941 F.2d 1292, 1295–96 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1161, 117 L.Ed.2d 408 (1992).

■ Sansone also believes that the penalty imposed was arbitrary and capricious because the Independent Administrator failed to adequately consider Sansone's character in imposing punishment. He also contends that his sins, if any, merit a proportionately lighter penalty than that imposed in other IBT disciplinary proceedings. We have reviewed the record carefully, and, while we agree that the penalty is severe, we cannot conclude that it is arbitrary or capricious. To the extent that Sansone claims that the Independent Administrator failed to consider his character, this suggestion is rebutted by the text of the decision which permitted Sansone to retain his IBT membership in recognition "of the many favorable character submissions made on Sansone's behalf."

Sansone sees a lack of proportionality between the penalty imposed upon him and those meted out in other IBT disciplinary proceedings where apparently more extreme conduct resulted in less severe penalties. We would be less than candid if we did not admit that we find the apparent discrepancy troubling.[7] The concern is ag-

6. The Consent Decree provides for the use of the just cause standard customarily applied in labor arbitration. Arbitrators routinely hold that there is no just cause when the employee has been deprived of due process. *Osborn & Ulland, Inc.*, 68 Lab.Arb. (BNA) 1146, 1152 (1977) (Beck, Arb.); *see generally McCartney's, Inc.*, 84 Lab.Arb. (BNA) 799 (1985) (Nelson, Arb.); *Amoco Chemicals Corp.*, 70 Lab.Arb. (BNA) 504 (1978) (Helburn, Arb.).

7. The specific cases cited by Sansone in support of this proposition are: *United States v. International Bhd. of Teamsters (Friedman & Hughes )*, 905 F.2d at 610 (officers given one year suspensions based on charges relating to their criminal RICO convictions); *United States v. Internation-*

*al Bhd. of Teamsters (Salvatore )*, 754 F.Supp. 333 (S.D.N.Y.1990) (officer was found to have participated in a scheme to divert union funds to indicted officers, yet received only a two-year bar); *United States v. International Bhd. of Teamsters (Morris & McNeil )*, 777 F.Supp. 1123 (S.D.N.Y.1991) (two union officers received five-year suspensions after being found guilty of misappropriating and converting union assets valued at over $60,000); *United States v. International Bhd. of Teamsters (Parise )*, 777 F.Supp. 1133 (S.D.N.Y.1991), *aff'd*, 970 F.2d 1132 (2d Cir.1992) (the respondent had pled guilty to a criminal charge of threatening violence against a union member, and had refused to answer

gravated because the district court failed to explicitly consider this issue in its review of the Independent Administrator's decision.

We conclude, nevertheless, that the apparent discrepancy between the penalty imposed here and those imposed in other cases does not inexorably compel the conclusion that the Independent Administrator acted arbitrarily or capriciously. While Sansone's penalty is admittedly drastic, and while it is true that there has been no suggestion that Sansone himself has ties to LCN, his refusal to recognize his duty to investigate union officials who are connected to organized crime indicated to the Independent Administrator that Sansone would again fail to investigate if a similar situation ever arose in the future, and Sansone were in a position of authority within the Union. As the district court concluded: "Sansone's repeated failure to investigate the Parrino allegations demonstrates that he is unfit to occupy a position of trust within the IBT." *Sansone I*, 792 F.Supp. at 1357.

We are not unmindful that this case involves the IBT and its crimson record of corruption. In an effort to maintain the institutional integrity of the Union and to dissipate a climate where union officials acquiesce in the criminal exploits of their colleagues, the Independent Administrator concluded that Sansone should be permanently barred from holding a position of authority in the union. We might not have reached the same conclusion. But we cannot say, on the record before us, that the conclusion was arbitrary or capricious.

## CONCLUSION

Based on the foregoing, the order of the district court affirming the Independent Administrator's decision is, in all respects, affirmed.

questions during his deposition, yet received only a 24–month suspension).